John FORTINO, Carl Meyers, and F. William Schulz, Plaintiffs–Appellees, Cross–Appellants,

v.

QUASAR COMPANY, A DIVISION OF MATSUSHITA ELECTRIC CORPORATION OF AMERICA, Defendant–Appellant, Cross–Appellee.

Nos. 91–1123, 91–1197 and 91–1564.

United States Court of Appeals,

Seventh Circuit.

Argued Oct. 15, 1991.

Decided Dec. 3, 1991.

Norman B. Berger, Aaron C. Horowitz,
Michael A. Reiter, argued, Holleb & Coff,
Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Steven L. Bashwiner, Brian W. Bulger,
Timothy J. Patenode, Gail C. Kalinich, Katten, Muchin & Zavis, Chicago, Ill., Paul L.
Bressan, argued, Kelley, Drye & Warren,
Los Angeles, Cal., for Matsushita Electric
Corporation of America, defendant-appellant, cross-appellee.

Gwendolyn Young Reams, John F.
Suhre, Carolyn L. Wheeler, Donald R. Livingston, Paula R. Bruner, E.E.O.C., Washington, D.C., for amicus curiae E.E.O.C.

Before BAUER, Chief Judge, and
POSNER and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

This suit charges the American subsidiary of a Japanese company with discriminating against its American executives on the basis of their age and national origin, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., respectively. A jury and judge (only the age claim was triable to a jury, since Title VII authorizes only equitable relief) awarded the three plaintiffs—John Fortino, Carl Meyers, and F. William Schulz, all former executives of Quasar Company, an unincorporated division of a U.S. corporation wholly owned by Matsushita Electric Industrial Company, Ltd., of Japan—$2.5 million in damages, to which the judge added almost $400,000 in attorneys' fees and costs. 751 F.Supp. 1306 (N.D.Ill.1990).

The most important question is whether a claim of discrimination on the basis of national *origin* is tenable when, as in this case, the discrimination is in favor of foreign *citizens* employed temporarily in the United States in accordance with a treaty between the U.S. and Japan that entitles companies of each nation to employ executives of their own choice in the other one. The plaintiffs ask us to close our eyes to the treaty because Quasar failed to mention it to the district judge. Ordinarily we will not consider a point that was not raised in the district court, but we can do so, *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), and, for the sake of international comity, amity, and commerce, we should do so when we are asked to consider the bearing of a major treaty with a major power and principal ally of the United States. Comity between the federal government and the states, though a weaker interest because states of the U.S. are only quasi-sovereigns, is an accepted reason for an appellate court to consider issues that would otherwise have been deemed waived because not raised in timely fashion, as held in *Younger v. Harris*, 401 U.S. 37, 40, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and the other cases cited in *Thomas v. State of Indiana*, 910 F.2d 1413, 1415–16 (7th Cir. 1990). This is a stronger case for overlooking waiver—especially since Quasar does not, as we understand its position, argue that the treaty is a *defense* to Title VII, and hence a ground for appeal, but merely that it is part of the essential background for understanding why this case is not within the scope of the statute. The treaty permits discrimination on the basis of citizenship, not of national origin; Title VII forbids discrimination on the basis of na-

tional origin, not of citizenship. The treaty is a reminder that the two forms of discrimination—citizenship and national origin—must not be run together, since one is permitted by treaty and the other forbidden by statute.

Quasar markets in the United States products made in Japan by Matsushita, which assigns several of its own financial and marketing executives to Quasar on a temporary basis. They are employees of Quasar and are under its day-to-day control but they also retain their status as employees of Matsushita and are designated as "MEI [Matsushita Electric Industrial] personnel" on Quasar's books. Quasar does not evaluate their performance—Matsushita does, and also keeps their personnel records and fixes their salaries and assists with the relocation of their families to the United States during the period of the assignment. These executives enter this country under "E–1" or "E–2" temporary visas, which permit the holder of the visa to work here, provided (so far as applicable to this case, which involves Japanese executives) that the work is executive or supervisory in character, the worker is a Japanese citizen, the company he is working for in the U.S. is at least half owned by Japanese nationals and has substantial trade or investment relations with Japan, and he is doing work authorized by the Treaty of Friendship, Commerce and Navigation between the United States and Japan.

In 1986 there were ten of these Japanese expatriate executives working for Quasar. (The parties call them "expatriates," though in common parlance the word is not applied to a person on merely temporary assignment to another country.) One was named Nishikawa. In 1985 Quasar had lost $20 million, and Nishikawa had been sent by Matsushita to prevent a recurrence of the loss. He was put in charge of Quasar and proceeded to reorganize the company, in the process reducing the work force, including management, by half. The three plaintiffs were among the American executives of non-Japanese origin who were discharged. None of the Japanese expatriate executives was discharged, although it appears that two were rotated

back to Japan and replaced by only one new expatriate. Far from being discharged, the expatriates received salary increases; the American executives of Quasar who were not discharged did not. Two out of Quasar's three Japanese–American employees were also discharged, but none of these was an executive.

■ Article VIII(1) of the treaty authorizes "companies of either Party [i.e., the U.S. and Japan], to engage, within the territories of the other Party ... executive personnel ... of their choice." The propriety of Matsushita's assigning its own executives to Quasar is further confirmed by the issuance of E–1 and E–2 visas to the Japanese expatriate executives. Nevertheless the district judge based his conclusion that Quasar had violated Title VII on the better treatment the company gave the Japanese expatriates compared to its American executives in 1986: it discharged none of the former but many of the latter, and it gave raises to all of the former and none of the latter. This was favoritism all right, but discrimination in favor of foreign executives given a special status by virtue of a treaty and its implementing regulations is not equivalent to discrimination on the basis of national origin.

■ We may assume that just as Title VII protects whites from discrimination in favor of blacks as well as blacks from discrimination in favor of whites, *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), so it protects Americans of non-Japanese origin from discrimination in favor of persons of Japanese origin. Title VII does not, however, forbid discrimination on grounds of citizenship. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Of course, especially in the case of a homogeneous country like Japan, citizenship and national origin are highly correlated; almost all citizens of Japan were born there. But to use this correlation to infer national-origin discrimination from a treaty-sanctioned preference for Japanese citizens who happen also to be of Japanese national origin

would nullify the treaty. This is true whether the correlation is used to prove intentional discrimination, as in this case, or to establish a disparate impact that the employer must justify on nondiscriminatory grounds. The exercise of a treaty right may not be made the basis for inferring a violation of Title VII. By virtue of the treaty, "foreign businesses clearly have the right to choose citizens of their own nation as executives *because they are such citizens." MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1144 (3d Cir.1988) (emphasis in original). See also *Wickes v. Olympic Airways,* 745 F.2d 363, 368 (6th Cir.1984). That right would be empty if the subsidiary could be punished for treating its citizen executives differently from American executives on the ground that, since the former were of Japanese national origin and the latter were not, it was discriminating on the basis of national origin. Title VII would be taking back from the Japanese with one hand what the treaty had given them with the other. This collision is avoided by holding national origin and citizenship separate. That was not done here.

■ But can Quasar, not being a Japanese company in the technical sense in which this term is used in the treaty, rely on the treaty even to the limited extent suggested? *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), held that an American subsidiary of a foreign parent was not protected by the treaty. But there was no contention that the parent had dictated the subsidiary's discriminatory conduct, and the Court left open the question whether the subsidiary might in such a case assert any of its parent's treaty rights. *Id.* at 189 n. 19, 102 S.Ct. at 2382 n. 19. We think it must be allowed to in a case such as this, at least to the extent necessary to prevent the treaty from being set at naught. A judgment that forbids Quasar to give preferential treatment to the expatriate executives that its parent sends would have the same effect on the parent as it would have if it ran directly against the parent: it would prevent Matsushita from sending its own executives to manage Quasar in preference to employing American citizens in these posts. Note, "Subsidiary Assertion of Foreign Parent Corporation Rights Under Commercial Treaties to Hire Employees 'Of Their Choice,' " 86 *Colum.L.Rev.* 139 (1986).

But suppose a Japanese company buys an American company, fires all of its new subsidiary's occidental executives because it is prejudiced against occidentals, and replaces them with Japanese citizens. The question would then arise whether the treaty of friendship in effect confers a blanket immunity from Title VII. On this there are different views. Compare *MacNamara v. Korean Air Lines, supra,* 863 F.2d at 1143–47, and *Linskey v. Heidelberg Eastern, Inc.,* 470 F.Supp. 1181, 1185–87 (E.D.N.Y.1979), with *Spiess v. C. Itoh & Co. (America), Inc.,* 643 F.2d 353 (5th Cir. 1981), vacated on other grounds, 457 U.S. 1128, 102 S.Ct. 2951, 73 L.Ed.2d 1344 (1982). We need not choose sides in this case, because (setting to one side the question of age discrimination, discussed next) there is no evidence of discrimination here save what is implicit in wanting your own citizens to run your foreign subsidiary. There is no evidence that if John Fortino had had three or for that matter four Japanese grandparents he would not have been fired. No favoritism was shown Quasar's Japanese–American employees, which would have been true national-origin discrimination since they are not citizens of Japan; and whatever his ancestry, Fortino would have had the irremediable disability of not being an executive of Matsushita. That was the real source of the "prejudice" against him, and it is not prejudice based on national origin. It may have had a similar effect to national-origin prejudice (though not identical—for look what happened to Quasar's Japanese–American employees) because of the correlation between citizenship and national origin, but the treaty prevents equating the two forms of discrimination or, what as a practical matter would amount to the same thing, allowing the first to be used to prove the second. If this conclusion seems callous toward the Americans who lost their jobs at Quasar, we remind that the rights granted by the

treaty are reciprocal. There are Americans employed abroad by foreign subsidiaries of U.S. companies who, but for the treaty, would lose their jobs to foreign nationals. Indeed, the treaty provision was inserted at the insistence of the United States. Japan was opposed to it. *Sumitomo Shoji America, Inc. v. Avagliano, supra,* 457 U.S. at 181 n. 6, 102 S.Ct. at 2377 n. 6.

▓▓▓ The Title VII claim must be dismissed, which leaves the age discrimination claim. We agree with the plaintiffs that there was enough evidence of age discrimination to make a jury issue, but we agree with Quasar that there must be a new trial because of trial error. We also agree that plaintiff Fortino's claim is barred altogether by the release that he executed. Let us begin with the release. Fortino executed a release of all pertinent claims against Quasar, including the age discrimination and Title VII claims, in exchange for additional severance benefits. The release is unambiguous, and indeed emphatic and comprehensive to the nth degree, as shown by the following paragraph:

As a material inducement to the Company to enter into this Agreement, I hereby irrevocably and unconditionally release, acquit and forever discharge the Company and each of the Company's predecessors, successors, assigns, agents, directors, officers, employees, attorneys, divisions, subsidiaries, affiliates (and agents, directors, officers, employees, representatives and attorneys of such parent companies, divisions, subsidiaries and affiliates), and all person acting by, through, under or in concert with any of them (collectively "Releasees"), or any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, including but not limited to, rights under federal, state or local laws prohibiting age or other forms of discrimination, claims growing out of any legal restrictions on the Company's right to terminate its employees ("Claim" or "Claims"), which I now have, own or hold, or claim to have, own or hold, or which I at any time heretofore have, owned or held, or claimed to have, own or hold, which I at any time hereinafter may have, own or hold or claim to have, own or hold against each or any of the Releasees.

We cannot imagine a more emphatic release, and nothing in the circumstances of its execution indicates that it should not be given the force that its words convey. Fortino, a business executive of more than twenty years' experience, educated, and earning in excess of $60,000, was not rushed to sign the release, and was told he could consult a lawyer before signing. Fortino testified that he didn't understand a lot of the terms, like "predecessors" and "successors." He should have. Anyway those particular terms are not germane; he is not trying to sue any predecessor or successor to Quasar. Fortino's wife showed the release to a lawyer at her place of work and he advised her, and through her Fortino, to sign the release and take the benefits because it would not stand up in court. Fortino signed, and took. The judge allowed the jury to consider whether Fortino understood the release, and it found he did not. The jury's conclusion went beyond the bounds of reason, and if upheld would make all accords and satisfactions, and perhaps all contracts, unenforceable.

We might as an original matter have supposed that the validity of a release of legal claims would be governed by the ordinary principles of contract law—a release of federal claims either by federal common law, the approach this court took in *Taylor v. Gordon Flesch Co.,* 793 F.2d 858, 862 (7th Cir.1986), or by state law, as suggested in *Morgan v. South Bend Community School Corp.,* 797 F.2d 471, 474–76 (7th Cir.1986), and *Dhaliwal v. Woods Division,* 930 F.2d 547, 548–49 (7th Cir.1991). Then Fortino would lose because he does not argue fraud, unconscionability, duress, or other conventional defenses to the enforcement of a contract. A number of the cases

dealing with the validity of releases of federal discrimination claims, however, have sorted the question into the waiver bin rather than the contract bin, and examined circumstances probative of the question whether the plaintiff's waiver of his legal claims was truly voluntary. Examples are *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 403 (2d Cir.1989), and *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 522–23 (3d Cir.1988), and from this court *Riley v. American Family Mutual Ins. Co.*, 881 F.2d 368, 374 (7th Cir.1989), where we suggested that if "a plaintiff is represented by counsel who actively negotiates the release," the plaintiff will be deemed to have made an effective waiver of the claims released, unless fraud or duress or other such "vitiating circumstances" are proved. Here the representation was indirect and the release was not negotiated, but that cannot be the end of the inquiry. Representation and negotiation cannot be the sine qua non of an effective waiver. If criminal defendants can effectively waive assistance of counsel, as of course they can, so can persons asked to release civil claims. And there is no suggestion that Quasar would have refused to negotiate over the terms of the release if requested to do so, which it was not. Even courts that follow a "totality of circumstances" approach, discussed in *id.* at 372, to the question of waiver would be bound to find that Fortino had made an effective release. For of the seven circumstances that these courts have identified, only one favors Fortino ("the role of plaintiff in deciding the terms of the agreement")—and that actually is ambiguous, since for all we know Fortino could have negotiated for better terms had he chosen to do so. He did not, because he thought he could have his cake and eat it. Quasar argues ratification as a back-up to its claim that the release was voluntary. We need not address the argument. If you sign a release knowing what you are giving up but believing on a lawyer's erroneous advice that really you're giving up nothing because the release is unenforceable, you are bound by your decision. *Id.* at 374; *Taylor v. Gordon Flesch Co.*, *supra*, 793 F.2d at 864; *Pilon v. University of Minnesota*, 710 F.2d 466, 468 (8th Cir.1983). Otherwise no releases, no accords and satisfactions, no contracts, period, would be enforceable against a party who became dissatisfied with the deal he had struck.

Some day we may have to choose among the three approaches that are on the table concerning the law governing settlements of federal antidiscrimination laws: federal common law, state law, waiver doctrine—and the last comes in several varieties. But not today. Under any approach, Fortino must lose.

■ That leaves Meyers' and Schulz's age discrimination claims. Here there were two trial errors, either of which would require reversal given the closeness of the case. First was the admission of a videotaped speech that one of the Japanese expatriates, Mr. Omoto, the marketing manager of Quasar's "Television Group," gave, in which he said that "because of a change in our TV Group organization at Headquarters, our average age of employee has become a lot younger [and] ... that means we will be ready to spend many hours, day and night, to help you out in your work." None of the plaintiffs was in the Television Group. Nor had Omoto any role in their discharge or, indeed, in that of any other employees. That was Nishikawa's role. Omoto was just a marketing guy. In these circumstances his comment about the average age of the employees in the Television Group had no probative value and, being prejudicial, was inadmissible. Fed.R.Evid. 403. "[A]ctions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination." *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1155 (7th Cir.1989). To the same effect see *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 925 (7th Cir.1988); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984), and other cases cited in *Normand v. Research Institute of America, Inc.*, 927 F.2d 857, 864 n. 3 (5th Cir. 1991).

We need not suppose that this principle is intended to be applied rigidly. *Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990). There may be cases where an employee who is outside the chain of decision nevertheless has valuable information bearing on the charge of discrimination. But not in this case. Omoto was not only outside the chain of decision; he was in a different department, and the plaintiffs made no effort to show that nevertheless he had information pertinent to the reasons behind their being discharged. His statement did not make the inference that the plaintiffs had lost their jobs because of their age more probable than it was without the statement.

■■■■■ The second error was the admission of testimony by Anthony Mirabelli. He was not a plaintiff, but he was one of the American executives whom Quasar discharged. He testified that Nishikawa's predecessor at Quasar, Yokoyama, had told him (Mirabelli) that Nishikawa planned "to reduce costs by targeting the older employees" for termination, which in Yokoyama's opinion would lead to a "major lawsuit."

Although Mirabelli had been included in a list of 109 "may call" witnesses for the plaintiffs, the failure to disclose to Quasar in advance his testimony about Yokoyama's statement violated the duty imposed by Rule 26(e) of the Federal Rules of Civil Procedure to supplement discovery responses in limited circumstances. There is no general duty of supplementation, but "a party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which ... the party knows that the response though correct when made is no longer true and the circumstances are such that the failure to amend the response is in substance a knowing concealment." Fed.R.Civ.P. 26(e)(2)(B). The strong term "knowing concealment" is designed, in recognition of the burden that a general duty of supplementation would impose in complex litigation, to protect a party who is reasonable in believing either that the change that has made his answer no longer accurate is known to his opponent or that it is a matter of no importance.

*Johnson v. H.K. Webster, Inc.,* 775 F.2d 1, 8 (1st Cir.1985); 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 2048, 2049 (1970).

Back in 1987 Quasar had sent the plaintiffs an interrogatory that asked them, so far as relevant here, to "state" "the identity of each communication that tends to support, confirm, or otherwise establish that" the reasons Quasar had given for the discharges were mere pretexts for age discrimination. In reply the plaintiffs had listed several letters, conversations, and other statements but none made by Yokoyama or to Mirabelli. Sometime before the trial the plaintiffs' counsel talked to Mirabelli and learned about Yokoyama's statement, but did not supplement their interrogatory answer or otherwise notify the defendant of what became key testimony in the case, harped on by the plaintiffs' counsel in the closing argument. "What more do you need for intentional discrimination?" he asked the jurors rhetorically.

The interrogatory asked the plaintiffs to state "the identity of each communication that tends to support" the plaintiffs' claims. The inquiry, open-ended as to time, was not limited to communications known to the plaintiffs when they received or answered the interrogatory. As soon as the plaintiffs obtained an additional communication that in their view tended to support their claims, the interrogatory answer, in failing to have listed that communication, became false. This didn't mean it had automatically to be supplemented. It did mean that it had to be supplemented if the circumstances made failing to supplement it a knowing concealment. Given the critical and unexpected nature of Mirabelli's testimony—Quasar could not have anticipated it and the plaintiffs could not have thought either that Quasar would anticipate it or that the testimony would be of merely incidental significance to the trial— the plaintiffs' failure to disclose it could not be shrugged off as an inadvertent or immaterial failure to supplement—the sort of thing easy to overlook in the haste and turmoil of trial preparation. It was unquestionably a violation of Rule 26. *Holi-*

*day Inns, Inc. v. Robertshaw Controls Co.,* 560 F.2d 856 (7th Cir.1977).

The sanction for such a violation is ordinarily within the discretion of the district judge. Note of Advisory Committee to 1970 Amendments to Rule 26, Subdivision (e); *Moore v. Boating Industry Associations,* 754 F.2d 698, 715 (7th Cir.), vacated on other grounds, 474 U.S. 895, 106 S.Ct. 218, 88 L.Ed.2d 218 (1985); *Hines v. Joy Mfg. Co.,* 850 F.2d 1146, 1153 (6th Cir. 1988); 8 Wright & Miller, *supra,* § 2050 at p. 326 n. 5. That discretion was not exercised here. The judge refused to bar Mirabelli's testimony because he was on the may-call witness list and because Quasar could have served additional interrogatories on the plaintiffs. These grounds do not respond to Quasar's concern. Quasar complained not because the plaintiffs called Mirabelli as a witness but because he testified to something that should have been disclosed in a supplementary response to the original interrogatory. And precisely because it should have been disclosed, Quasar had no reason to believe, before Mirabelli opened his mouth to testify, that it should serve additional interrogatories to avoid being surprised.

The plaintiffs defend the judge's ruling on a basis different from his, that Quasar should have requested a continuance to enable it to track down Yokoyama in Japan. Since the judge has a broad discretion to decide the appropriate sanction for a violation of Rule 26(e), and continuance is one of the "sanctions" expressly mentioned in the Note of the Advisory Committee, the plaintiffs might have a good point had the judge found a violation of Rule 26(e) and turned to the question of the appropriate sanction. *Moore v. Boating Industry Associations, supra,* 754 F.2d at 716. But since he found no violation, it was hardly likely that he would be receptive to a request to interrupt a jury trial so that Quasar could embark on what might be a wild goose chase after Yokoyama.

The issue will not recur on remand. Quasar now has ample notice as to what Mirabelli will testify to in the new trial that we feel compelled to order. Also moot in light of our decision is the question whether entitlement to postjudgment interest runs from the date of the jury verdict or the date of the entry of a final, appealable judgment; however, for the guidance of the parties on remand we note that authority favors the former approach. *Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 845–46 (7th Cir.1978); *Marshall v. Perez–Arzuaga,* 866 F.2d 521 (1st Cir. 1989).

For the same reason we point out that prejudgment interest should *not* be awarded in a case such as this where the violation of the age discrimination law is found to be willful and as a result the damages are doubled (the statute calls the extra dollop "liquidated damages"). Like most of the other circuits, we have held that if double damages are awarded prejudgment interest may not be awarded. *EEOC v. O'Grady,* 857 F.2d 383, 391 n. 13 (7th Cir.1988); *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1337 and n. 7 (7th Cir.1987), vacated on other grounds, 486 U.S. 1020, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988); *Powers v. Grinnell Corp.,* 915 F.2d 34, 39–42 (1st Cir.1990); *Burns v. Texas City Refining, Inc.,* 890 F.2d 747, 752–53 (5th Cir.1989). A few decisions, illustrated by *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 281–82 (2d Cir.1987), hold that because the Supreme Court has, realistically enough, described the doubling of damages for a willful violation as an award of punitive damages (despite the statutory appellation "liquidated damages"), *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 125–26, 105 S.Ct. 613, 623–24, 83 L.Ed.2d 523 (1985), it must follow that the additional damages do not compensate for delay, leaving that office to be performed by prejudgment interest. We agree both that the purpose of prejudgment interest is to make sure that an award of compensatory damages is fully compensatory and that it is a salutary purpose—as a matter of fact we have held that such interest is presumptively available in cases under federal law. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989). But when such interest is added to an award that is

half punitive, as the plaintiffs would have us do, it ceases to have a compensatory function and becomes an unauthorized form of punitive damages.

Even confined to the compensatory part of the award, prejudgment interest would be questionable. A recognized if secondary (and often implicit) purpose of punitive damages is to make sure that the judgment does not inadvertently undercompensate the plaintiff. *Rinaldi v. Rinaldi*, 122 Mich.App. 391, 396, 333 N.W.2d 61, 63 (1983); *Cox v. Stolworthy*, 94 Idaho 683, 692, 496 P.2d 682, 690–91 (1972), overruled on other grounds in *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 665 P.2d 661 (1983); *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, 100, 434 P.2d 828, 831 (1967); Bruce Chapman & Michael Trebilcock, "Punitive Damages: Divergence in Search of a Rationale," 40 *Ala.L.Rev.* 741, 761–78 (1989); Dan B. Dobbs, *Handbook on the Law of Remedies: Damages—Equity—Restitution* 205 (1973); *Prosser and Keeton on the Law of Torts* § 2, at p. 9 (W. Page Keeton *et al.* eds. 5th ed. 1984). (The primary purpose of course is deterrence. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794, 797 (7th Cir. 1986).) So there is a risk that an award of prejudgment interest in a case in which punitive damages have been awarded will overcompensate the plaintiff and perhaps overdeter potential wrongdoers. How great a risk, we do not know. But its existence persuades us to adhere to our circuit rule, notwithstanding *Thurston* and the theoretical possibility that delay in reaching judgment might be so great that the doubling of the plaintiff's actual damages might fail adequately to compensate him and deter wrongdoers.

■■■ Only one issue remains to be discussed (again for the guidance of the parties on remand), and that is whether "front pay" is a question for the jury or for the judge in an age discrimination case. The term refers to a situation in which for one reason or another it isn't feasible to order the successful plaintiff reinstated in the defendant's employ. An award of front pay is designed to monetize the value of that lost opportunity. Because Title VII authorizes only equitable relief and front pay resembles common law damages for breach of an employment contract, the very possibility of front pay under Title VII is uncertain, *McKnight v. General Motors Corp.*, 908 F.2d 104, 116–17 (7th Cir.1990), though many courts have awarded it. There is no similar problem under the age discrimination law, which authorizes legal as well as equitable relief. 29 U.S.C. § 626(b). But the question remains whether an award of front pay should be deemed legal because it resembles common law damages, and therefore triable by a jury, or equitable because it is in lieu of the equitable remedy of reinstatement. (A court of equity has the power to make an award of damages in substitution for an equitable remedy that the plaintiff wants and is entitled to as a matter of strict principle but that for some reason is not feasible. 1 *Pomeroy's Equity Jurisprudence* § 237e (Spencer W. Symons ed. 5th ed. 1941). This is an aspect of the clean-up doctrine, *id.*, § 231, on which see also *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442–43 (7th Cir.1984).) The former characterization would knock it out of Title VII. The latter characterization is the one the courts employ, however, even in age discrimination cases, *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1055 (7th Cir.1990); *Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 616 (1st Cir.1985); *Maxfield v. Sinclair International*, 766 F.2d 788, 796 (3d Cir.1985); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1100 (8th Cir.1982), and we agree with the Second Circuit that this means there is no right to a jury trial. *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1257–58 (2d Cir.1987). *Dominic* sensibly rejects, as unworkable, dicta in *Maxfield* and *Coston* suggesting that the right to front pay is to be determined by the court but the amount of front pay by the jury.

Quasar has raised some sharp questions about the computation of front pay in this case, but they are questions of detail and since there must be a new trial on the age discrimination claim we think it best to let

them abide the remand. The award of attorneys' fees must of course be set aside to abide the remand as well, and the plaintiffs concede that any award of expert witness fees may not exceed the statutory maximum. 28 U.S.C. § 1821(b); *West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991).

The judgment is reversed with directions to enter judgment for the defendant on the Title VII claims, to dismiss Fortino, and to conduct a new trial, consistent with this opinion, on Meyers' and Schulz's claims of age discrimination.

REVERSED AND REMANDED, WITH DIRECTIONS.