**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-20584
_____


W.G. BENNETT,

             Plaintiff-Appellee-Cross-Appellant,


VERSUS


TOTAL MINATOME CORPORATION,

             Defendant-Appellant-Cross-Appellee.


_____

Appeals from the United States District Court
For the Southern District of Texas
_____

April 29, 1998

Before DAVIS, WIENER, and PARKER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

     W.G. Bennett brought this employment discrimination suit against his employer, Total Minatome Corporation ("TMC").  Bennett alleged that TMC unlawfully discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e _et seq._, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 _et seq._, and 42 U.S.C. § 1981.  The district court entered judgment in favor of Bennett on each of his claims.  For the reasons that follow, we reverse.

                              I.

     TMC, an oil and gas company incorporated in Delaware, is the wholly owned subsidiary of TOTAL, S.A. ("TOTAL"), a French

corporation headquartered in Paris, France.  Bennett, an American citizen born in Mississippi, was hired as a manager by TMC on April 1, 1987, less than one month before his 51st birthday.  Over the next four years, Bennett was promoted twice, at age 52 and at age 54.

For some time, TOTAL has maintained a practice of assigning TOTAL employees to TMC on a temporary basis.  These French "expatriates" generally occupy key executive or technical positions at TMC, including president.  Between 1987 and 1991, in response to a decline in the oil business, TMC undertook several corporate "restructurings."  In May 1989, during one such restructuring, TMC terminated three American managers over the age of 50.  In March 1991, during another restructuring, TMC laid off approximately 15% of its workforce, including four American managers over the age of 40 and a fifth who was six months shy of his 40th birthday.

In July 1991, TOTAL replaced TMC's then-president, Jean Pierre Donnet, with another French expatriate, Jean Michel Fonck, who was sent with the mandate to "to reorganize completely the company."  In September 1991, as part of his reorganization efforts, Fonck decided to replace Bennett, who then held the position of Production Manager, with a younger French expatriate, Jean Granger.  Bennett was transferred to the position of Manager of Acquisitions and Divestments.  Although he had been responsible for supervising 150 employees in his former position, he did not supervise any employees in his new position.  In his new position he had no purchasing authority, whereas in his former position he had

signature authority up to $150,000. His new position also required that he occasionally perform manual tasks such as moving boxes of documents and operating a copy machine.

In September 1993, TOTAL recalled Granger to France. Bennett's request for reinstatement was denied, and the title of Bennett's former position was changed to Drilling and Production Manager. At TOTAL's direction, Granger was replaced by another younger French expatriate, Jean Louis Geyelin. In the summer of 1996, Geyelin rotated back to France. Pursuant to a budgetary directive from TOTAL, TMC did not replace Geyelin and eliminated the position.

Bennett filed suit on September 1993, complaining that his transfer was a demotion and that TMC continued to discriminate against him[1] on account of his age, in violation of the ADEA; national origin, in violation of Title VII; and race, in violation of § 1981.[2] Bennett's Title VII claim, to the extent it was based

---

[1] Bennett claimed that TMC continued to discriminate against him by, among other things, requiring him to perform manual tasks, placing him in a smaller office, reducing the number of employees he supervised, deleting him from distribution lists for internal memoranda, and denying him a raise in 1992 and a bonus in 1993. He also claimed that TMC discriminated against him in refusing to reinstate him to his former position after Granger rotated back to France.

[2] Bennett claimed that TMC discriminated against him because he was "not of French ancestry." Racial discrimination under § 1981 encompasses discrimination against "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Although TMC argues that Bennett failed to allege membership in an identifiable ethnic group, that is an issue we need not decide.

3

on acts occurring prior to November 21, 1991,[3] was tried to the court. His remaining claims were tried to a jury. The court and the jury found for Bennett on each of his claims. On November 8, 1996, the court entered judgment awarding Bennett $152,100 in backpay; $300,000 in compensatory damages; $970,000 in punitive damages; and $391,722.73 in attorneys' fees. The court denied TMC's post-trial motion for judgment as a matter of law on Bennett's claims and Bennett's motion to amend the judgment to include an award of front pay. Both TMC and Bennett appeal.

## II.

TMC contends that Bennett's claims are barred by Article VI of the Convention of Establishment between the United States and France, (the "Convention"), one of a series of commercial treaties negotiated by the United States with a number of other countries in the years following World War II. *See* 106 Cong. Rec. 16561-63 (1960).[4] *Id.* Article VI of the Convention provides in pertinent part:

> Nationals and companies of either High Contracting Party shall be permitted to engage, at their choice, within the territories of the other High Contracting Party, accountants and other technical experts, lawyers, and

---

[3] The effective date of the Civil Rights Act of 1991. Prior to the passage of the Act, Title VII plaintiffs could seek only equitable relief. *See, e.g., Hampton v. IRS,* 913 F.2d 180, 182 (5th Cir. 1990).

[4] The central purpose of the treaties was to encourage investment abroad by granting companies of each signatory legal status in the territory of the other country and by allowing them to conduct business in the other country on a comparable basis with domestic firms. *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185-88 (1982); *MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1142-43 (3d Cir. 1988); 106 Cong. Rec. 16563 (1960).

personnel who by reason of their special capacities are essential to the functioning of the enterprise.

11 U.S.T. 2398, 2405.  TMC argues that Article VI thus permits French companies conducting business in the United States to discriminate in favor of French citizens in filling the positions specified therein without running afoul of domestic laws such as Title VII or the ADEA.

The parties' dispute centers on whether TMC, the wholly owned U.S. subsidiary of a French company, may assert rights under the Convention.  In *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 189 (1982), the Supreme Court held that a wholly owned U.S. subsidiary of a Japanese company was not covered by Article VIII(1) of the Friendship, Commerce and Navigation Treaty between the United States and Japan (the "Japan FCN treaty"), a provision similar to Article VI.[5]  The Court, however, expressly reserved the question of whether the U.S. subsidiary could assert any of its parent's rights under the treaty.  *Id.* at 189-90 n.19.

In *Fortino v. Quasar Co.*, 950 F.2d 389, 393 (7th Cir. 1991) (Posner, J.), the Seventh Circuit concluded that a wholly owned U.S. subsidiary of a Japanese company could assert its parent's rights under Article VIII(1) of the Japan FCN treaty to the extent that the parent dictated the subsidiary's alleged discriminatory conduct.  In *Fortino*, the parent company maintained a practice of

---

[5]     Article VIII(1) of the Japan FCN treaty provides in pertinent part:  "[C]ompanies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice."  *See Sumitomo,* 457 U.S. at 181.

assigning several of its financial and marketing executives to the subsidiary on a temporary basis. These "expatriates" were employees of the subsidiary and were under its day-to-day control, yet they also retained their status as employees of the parent company. The parent evaluated their performance, kept their personnel records, fixed their salaries, and assisted with the relocation of their families to the United States. The expatriates entered the United States under "E-1" or "E-2" temporary visas, which permitted the holder to work in the United States provided, among other things, that the work was executive or supervisory in character, that the worker was a Japanese citizen, and that the worker was doing work authorized by the Japan FCN Treaty.

The plaintiffs in *Fortino* were American executives discharged by a Japanese expatriate put in charge of the subsidiary by the parent to prevent the recurrence of a massive loss and who proceeded to do so by reorganizing the company and reducing the workforce, including management, by half. No Japanese expatriate executive were terminated, although two were rotated back to Japan and replaced by a single new expatriate. The court held that the subsidiary was entitled to judgment in its favor, reasoning that "[a] judgment that forbids [the subsidiary] from giving preferential treatment to the expatriate executives that its parent sends would have the same effect on the parent as it would have if it ran directly against the parent: it would prevent [the parent] from sending its own executives to manage [the subsidiary] in preference to employing American citizens in such posts." *Id.* at

393.

In *Papaila v. Uniden America Corp.*, 51 F.3d 54, 56 (5th Cir. 1995), following the lead of the Seventh Circuit in *Fortino*, we held that a wholly owned U.S. subsidiary of a Japanese entity could invoke its parent's rights under Article VIII(1) of the Japan FCN Treaty with respect to employment decisions dictated by the parent. In *Papaila*, the parent company also assigned "expatriate" employees to work for the subsidiary on a temporary basis. The expatriates were sent to protect the parent's rights in the subsidiary and were subject to transfer at the parent's request. The parent set the expatriate's salaries, wages, benefits and hours, directed that the subsidiary maintain a separate payroll account for the expatriates, and evaluated their job performance. The plaintiff in *Papaila* alleged that Japanese expatriates received favorable treatment in terms of salaries, benefits, and job protection. We affirmed the district court's grant of summary judgment in favor of the subsidiary because the parent was responsible for the alleged discriminatory conduct.

TMC contends that it is clear from the record that TOTAL dictated the decision to replace Bennett with Granger, as well as the decision not to reinstate him after Granger rotated back to France. Bennett, on the other hand, contends that there is no evidence that these decisions were dictated by TOTAL. We conclude that the record indeed discloses that the decisions were dictated by TOTAL and that, under *Papaila*, TMC may assert TOTAL's rights under the Article VI of the Convention.

7

Like the foreign parents in *Papaila* and *Fortino*, TOTAL assigned its own executives to TMC on a temporary basis. Expatriate executives maintained their status as TOTAL employees and could not be fired by TMC. Similar to what occurred in *Fortino*, Fonck was put in charge of TMC by TOTAL with the mandate to completely reorganize TMC. As part of his reorganization efforts, he replaced Bennett with Granger. Later, Granger was called back to France and TOTAL directed that he be replaced by Geyelin.

As mentioned above, TMC contends that Article VI of the Convention permits French companies operating in the United States to discriminate in favor of French citizens in filling the positions specified therein without running afoul of domestic laws such as Title VII or the ADEA. The Convention is patterned after the post-World War II commercial treaties that preceded it, including the Japan FCN Treaty and the Treaty of Friendship, Commerce, and Navigation between the United States and Korea ("Korea FCN treaty").[6] *See* 106 Cong. Rec. 16561-63 (1960). Those treaties each contain a provision similar to Article VI.[7] Courts

___

[6] The Convention was signed on November 25, 1959. The Japan FCN treaty and the Korea FCN treaty were signed on April 2, 1953 and November 28, 1956, respectively.

[7] As noted above, Article VIII(1) of the Japan FCN treaty provides in pertinent part: "[C]ompanies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice."

Article VIII(1) of the Korea FCN treaty provides in pertinent part: "Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party,

8

have interpreted these provisions as granting foreign businesses operating in the United States the right to discriminate in favor of citizens of their home countries because of their citizenship. *See Papaila*, 51 F.3d at 55 (interpreting similar provision in Japan FCN treaty); *MacNamara v. Korean Air Lines*, 863 F.2d 1135, 1144-46 (3d Cir. 1988) (interpreting similar provision in Korea FCN treaty and expressly rejecting argument that the treaty grants Korean companies immunity from liability under Title VII and the ADEA insofar as they discriminate in favor of Korean citizens in filling certain positions specified therein). Thus, we conclude that, at the very least, Article VI grants French companies operating in the United States the right to discriminate in favor of French citizens because of their citizenship in filling the positions specified therein. We need not decide whether Article VI immunizes French companies to the extent urged by TMC because the record contains no evidence that Bennett was discriminated against on any basis other than his citizenship.

### III.

As discussed above, Article VI of the Convention grants TOTAL the right to discriminate in favor of French citizens in selecting, among other things, technical experts essential to its functioning.[8] Because we have concluded that TOTAL was responsible

---

accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." *See MacNamara*, 863 F.2d 1135, 1138 (3d Cir. 1988).

[8]    It is undisputed that Granger and Geyelin were "technical experts" within the meaning of the Convention.

for the decision to replace Bennett, TMC may assert TOTAL's rights under Article VI.  As the court noted in *Fortino*, "[t]he exercise of a treaty right may not be made the basis for inferring a violation of Title VII."  950 F.2d at 393.  Here, there is no evidence that TOTAL did anything other than exercise its treaty right to select French citizens as technical experts.

In support of his Title VII and § 1981 claims, Bennett points to evidence that he claims shows that "the French," -- i.e., French citizens -- received preferential treatment at TMC.[9]  He does not point to any evidence, however, that shows that "the French" were treated preferentially because of their national origin or race, as opposed to their citizenship.  For example, he does not point to any evidence that American citizens of French ancestry were shown favoritism.  *See, e.g., Fortino,* 950 F.2d at 393 (no evidence of national origin discrimination where there was no evidence of favoritism shown Japanese-American employees).  Although citizenship and national origin may be highly correlated, they should not be equated with one another, particularly in light of the Convention.  *See id.* at 393.  By themselves, the facts on which Bennett relies simply do not support an inference of national origin or race discrimination.  Accordingly, we conclude that TMC

---

[9]    Bennett claims that the evidence adduced at trial shows that:  1) the French received preferential treatment; 2) the French met among themselves regardless of seniority; 3) junior French employees knew more at TMC than senior Americans; 4) TMC required poor evaluations of Frenchman to be adjusted; and 5) French raises and bonuses were adjusted upward at the expense of Americans.

10

is entitled to judgment on Bennett's Title VII and § 1981 claims.[10]

IV.

That leaves us with Bennett's age discrimination claim. Bennett alleged that TMC discriminated against him on the basis of age in demoting him, denying him a raise in 1992 and a bonus in 1993, and refusing to reinstate him after his former position became available. We will first address Bennett's contention that TMC discriminated against him in demoting him and in refusing to subsequently reinstate him.

A plaintiff may establish a prima facie case of age discrimination with respect to a demotion or a failure to promote by demonstrating that: 1) he was demoted or not promoted, as the case may be; 2) he was qualified for the position he occupied or sought; 3) he was within the protected class at the time of the demotion or failure to promote; and 4) either i) the position he occupied or sought was filled by someone outside the protected

---

[10] We realize that Bennett's Title VII and § 1981 claims are not based solely on TMC's decision to replace him with Granger and its refusal to subsequently reinstate him after his former position became available. Bennett claimed that TMC continued to discriminate against him after demoting him by, among other things, requiring him to perform manual tasks, placing him in a smaller office, and reducing the number of employees he supervised. Title VII, however, was "`designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'" *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (citation omitted). "`Ultimate employment decisions' include acts `such as hiring, granting leave, discharging, promoting, and compensating.'" *Id.* (citation omitted). Most of the conduct of which Bennett complains does not constitute an "ultimate employment decision." In any event, the evidence to which Bennett points does not raise a reasonable inference of national origin or race discrimination with respect to such conduct.

class; ii) the position he occupied or sought was filled by someone younger; or iii) he was otherwise demoted or not promoted because of his age. *See Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992 (5th Cir. 1996) (en banc). Once established, the prima facie case raises an inference of unlawful discrimination. *Id.* The burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action. *Id.* at 992-93. The plaintiff is then accorded the opportunity to demonstrate that the defendant's articulated rationale was merely a pretext for discrimination. *Id.* at 993.

A jury may be able to infer discriminatory intent in an appropriate case from substantial evidence that the employer's proffered reasons are false. *Id.* at 994. For example, the evidence may strongly indicate that the employer has introduced fabricated justifications for an employee's discharge, and not otherwise suggest a credible nondiscriminatory explanation. *Id.* In contrast, if the evidence put forth by the plaintiff to rebut the employer's reasons is not substantial, a jury cannot reasonably infer discriminatory intent. *Id.* In some cases, for instance, the fact that one of the nondiscriminatory reasons in the record has proved highly questionable may not be sufficient to cast doubt on the remaining reasons. *Id.* An employer is entitled to judgment in its favor if the evidence taken as a whole would not allow a jury to infer that the actual reason for the adverse employment action was discriminatory. *Id.*

Our review of the record leads us to conclude that Bennett

12

failed to produce substantial evidence of pretext and that the evidence is otherwise insufficient to support a reasonable inference of age discrimination. TMC proffered several legitimate, nondiscriminatory reasons for replacing Bennett with Granger and for subsequently refusing to reinstate him. One reason TMC claimed it replaced Bennett with Granger and, subsequently, Geyelin was the ability of both men to speak French and thereby communicate more effectively with TOTAL personnel in France.[11] Rather than present evidence to rebut this rationale, however, Bennett sought to establish Granger's ability to speak French as a significant factor in the decision to replace him with Granger. He thus queried of Fonck:

> Q.   [Y]ou would agree that it was a motivating factor?
>
> A.   Yes, it was a significant factor.

And questioned Douglas Burgess, Vice President of Operations, thus:

> Q.   Now, Mr. Burgess, isn't it true that one of the reasons that Mr. Granger was placed in the production manager position was because it was believed that he could communicate more effectively with the people in Paris?
>
> A.   I'm sure that was considered. I don't know that it was the controlling criteria.
>
> Q.   Well, in fact, you testified, didn't you, that it was a consideration in putting Mr. Granger, a Frenchman, in the spot held by Mr. Bennett?
>
> A.   And I believe that to be the case.

---

[11]   The other reasons proffered by TMC were that Bennett had insufficient offshore experience; that he lacked team-building skills; and that he failed to run certain studies on three onshore projects. An additional reason proffered by TMC for refusing to subsequently reinstate Bennett was that he lacked drilling experience.

Q. Okay. In fact, when you talked to Mr. Fonck, that was one of the things that you and he had discussed? That's what he had told you?

A. That's correct.

Q. And you believe that being able to speak French gave Mr. Granger an advantage, in terms of being able to communicate effectively with people in Paris?

A. Yes.

Q. You felt that that was an advantage that he had over the American?

A. Yes.

Moreover, Bennett did not produce any evidence that would have called into question the desirability of having someone in his position be able to communicate in French with TOTAL personnel. In fact, Bennett presented evidence that French workers had regular telephone communications with personnel in France.

Assuming *arguendo* that Bennett produced substantial evidence that TMC's other proffered reasons were pretextual, his doing so would nevertheless be insufficient to cast doubt on TMC's articulated rationale that it replaced Bennett because he did not speak French. This rationale relates to a credible nondiscriminatory explanation suggested by the evidence for Bennett's replacement and TMC's refusal to subsequently reinstate him: TOTAL, through TMC, was simply exercising its right under Article VI of the Convention to select French citizens as technical experts.

None of the other evidence on which Bennett relies supports a reasonable inference of age discrimination. First, Bennett relies on a 1993 article in a magazine published by TOTAL in which Theirry

14

Desmarest, TMC's chairman of the board of directors, announced: "It is our intention to continue recruitment, but at a more moderate rate, focusing exclusively on young people." This comment cannot serve as evidence of age discrimination because it does not refer in any way to Bennett's age or the employment decisions of which he complains. *See, e.g., Turner v. North American Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir. 1992) (comment by plaintiff's supervisor that he was sending him "three young tigers" to assist with operations not sufficient evidence of age discrimination because it did not refer in any way to plaintiff's age and was not in any way related to plaintiff's discharge).

Bennett also relies on evidence that during the 1989 and 1991 restructurings TMC terminated a number of managers over the age of 40 and that during the 1991 restructuring TMC promoted several managers under the age of 40. Bennett, however, did not present any evidence demonstrating that the results of the restructurings were statistically significant. Although he attempted to elicit such an admission from Ira Chorush, TMC's statistical expert, Chorush testified that he would need additional information before he could state conclusively whether the results were statistically significant. Because Bennett failed to demonstrate statistical significance, he failed to raise a reasonable inference of age discrimination. *See Anderson v. Douglas & Lomason Co., Inc.,* 26 F.3d 1277, 1291-92 (5th Cir. 1994) (no inference of disparate treatment where disparities not statistically significant); *Ottaviani v. State Univ. of New York at New Paltz*, 875 F.2d 365,

15

371 (2d Cir. 1989) ("Before a deviation from a predicted outcome can be considered probative [of discrimination], the deviation must be 'statistically significant.'").

We turn now to Bennett's claim that TMC denied him a raise in 1992 and a bonus in 1993 because of his age. Bennett could have established a prima facie case of disparate treatment by showing that younger managers received raises and bonuses under circumstances "nearly identical" to his. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995). Bennett, however, did not produce any evidence that the other managers who received raises and bonuses were similarly situated to him. Nor did he present any other evidence that would raise an inference of age discrimination.

In sum, we conclude that Bennett failed to produce sufficient evidence to raise a reasonable inference of age discrimination. We also observe that weighing against a finding of age discrimination is the fact that TMC hired Bennett at age 50, promoted him at age 52, and then promoted him once again at age 54.

V.

For the reasons set out above, we conclude that there is no evidence that TOTAL did anything other than exercise its treaty right to select French citizens as technical experts, and that the record in this case does not support a reasonable inference of national origin, race, or age discrimination. We therefore reverse the judgment of the district court and render judgment in favor of TMC.

16

REVERSED and RENDERED.