Karen M. **EMMEL**, Plaintiff,

v.

**COCA–COLA BOTTLING COMPANY OF CHICAGO, INC.**, Defendant.

No. 93 C 2290.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 29, 1995.

Ernest Thomas Rossiello, Margaret Ann Zuleger, Rossiello & Associates, Chicago, IL, for plaintiff.

Marian Conroy Haney, Marcia E. Goodman, Danuta Bembenista Panich, Eric S. Dreiband, Mayer, Brown & Platt, Chicago, IL, Jeffrey S. Fowler, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL, William Robert Sullivan, Jr., Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

In April 1993, plaintiff Karen M. Emmel, after complying with the jurisdictional prerequisites, filed the initial complaint in this suit (R.[1] 1–1) under Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C.

---

1. The designation "R." indicates the record docket entry in the original district court file in this case, No. 93 C 2290.

§ 2000e–2(a)(1). The complaint alleged that defendant Coca–Cola Bottling Company of Chicago, Inc.[2] ("Coca–Cola") committed employment discrimination in 1992 against plaintiff Emmel because of her gender. Plaintiff filed a second complaint in May 1994 alleging the occurrence of additional acts of sex discrimination against her by defendant in 1993. The second complaint was filed as Case No. 94 C 3230. An amended complaint consolidating plaintiff's claims against defendant and alleging acts of sex discrimination in both 1992 and 1993 as well as alleging retaliatory discharge in August 1994 was filed on September 16, 1994. (R. 99.) The trial commenced before a jury pursuant to 42 U.S.C. § 1981a on November 1, 1994. (Tr.[3] 1.)

The evidence established that during 1992 and 1993 plaintiff Emmel was denied promotions to certain positions in the upper-management of the defendant company for which she was qualified. Each open position denied to plaintiff in defendant's upper-management was offered to and filled by a man. The evidence at the trial also established that Coca–Cola had a policy of discrimination against women in upper-management positions enunciated by the owner of defendant company, Marvin Herb, or at the very least, had reckless indifference to the federally protected rights of the women qualified for such positions to be free from sex discrimination. The first proof of the discriminating policy's existence surfaced in 1986 (Tr. 153–154, 903–906, 994) and was confirmed by plaintiff's direct supervisor in July 1992 (Tr. 918–19) that the top officials of Coca–Cola had wanted men in these positions. The evidence presented at the trial further showed that at no time while under the private ownership of Marvin Herb (Tr. 56, 90) did Coca–Cola ever allow any woman to hold any of the upper-management positions defendant denied to plaintiff (Tr. 58–61, 95–96) because of defendant's gender discrimination.

On November 21, 1994 the jury in this case, after evaluating all the evidence presented at trial, found that defendant Coca–Cola had unlawfully discriminated against plaintiff because of her gender in connection with three promotions to upper-management positions that defendant had denied to plaintiff during 1992 and 1993.[4] The jury in returning its verdict (R. 150) in plaintiff's favor as to the three promotions responded in its verdict to detailed special interrogatories and stated:

a. "that plaintiff's sex was, more likely than not, a motivating factor in the decision of defendant, HONDO INCORPORATED, doing business as COCA–COLA BOTTLING CO. OF CHICAGO, not to promote plaintiff, KAREN EMMEL, to one of the five positions of Area Development Manager on or about July 8, 1992." (Interrogatory No. 1.) (R. 150.)

b. "that plaintiff's sex was, more likely than not, a motivating factor in the decision of defendant, HONDO INCORPORATED, doing business as COCA–COLA BOTTLING COMPANY OF CHICAGO, not to promote plaintiff, KAREN EMMEL, to one of the three positions of Key Account Executive on or about September 15, 1993." (Interrogatory No. 3.) (R. 150.)

c. "that plaintiff's sex was, more likely than not, a motivating factor in the decision of defendant, HONDO INCORPORATED, doing business as COCA–COLA BOTTLING COMPANY OF CHICAGO, not to promote plaintiff, KAREN EMMEL, to one of the two positions of Area Development Manager on or about September 15, 1993." (Interrogatory No. 4.) (R. 150.)

---

2. The defendant does business under the tradename Coca–Cola Bottling Company of Chicago, Inc. The actual corporate name of the defendant is Hondo Incorporated.

3. The designation "Tr." indicates the trial transcript page citation. The designation "Tr." when preceded by a date indicates a transcript citation

to a pretrial or post-trial proceeding in court on the stated date.

4. The jury found in defendant's favor as to promotions to the position of Region Manager. The jury also found in defendant's favor on plaintiff's retaliatory discharge claim. (R. 150.)

■ The jury by answering the explicit questions of the special interrogatories addressing the issue of liability found credible the evidence that plaintiff had presented regarding the three promotions denied her because of defendant's sex discrimination. The jury in so doing exercised its prerogative to reject as not credible the evidence presented by the defense to the contrary *EEOC v. G–K–G, Inc.,* 39 F.3d 740, 746–47 (7th Cir.1994). This court must defer to those findings since they are adequately supported by the evidence presented at the trial of the case just as appellate judges must do in viewing a district judge's findings. *See Carr v. Allison Gas Turbine Division, General Motors Corporation,* 32 F.3d 1007, 1008 (7th Cir.1994); *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 426 (7th Cir.1992).

The jury, after finding for plaintiff on three promotions that plaintiff had been denied, found that plaintiff's lost wages and salaries up to the date of the jury's verdict, minus any amount resulting from any failure by plaintiff to mitigate damages, totalled $43,000. (R. 150, Interrogatory No. 7.) The jury also found that plaintiff had sustained damages of $7,325 for humiliation, inconvenience, emotional pain and suffering as a result of defendant's discrimination (R. 150, Interrogatory No. 8.) The jury also found that defendant acted with malice or reckless indifference for the federally protected rights of plaintiff to be free from sex discrimination and assessed punitive damages in the amount of $500,000 against the defendant "to punish the defendant and to deter it and other employers from similar conduct in the future." (R. 150, Interrogatory No. 9.)

Applying the statutory limitation that related to the defendant company, the court reduced the jury's verdict of $507,325 in compensatory and punitive damages to the statutory cap of $300,000.[5] After adding the statutorily allowed $300,000 to the $43,000 of back pay that the jury found defendant owed plaintiff up to the date of the verdict, the court entered a judgment of $343,000 in favor of the plaintiff and against the defendant. (R. 152.)

■ The following post-trial motions, listed in the order in which they were filed, have been briefed and are pending:

1. Plaintiff's Motion for Prejudgment Interest (R. 153);

2. Plaintiff's Motion for Lost Benefits Resulting from Employment Discrimination by Defendant (R. 154);

3. Plaintiff's Motion for Permanent Injunction Enjoining Further Violation of 42 U.S.C. 2000e–2(a) (R. 155);

4. Defendant's Renewed Motion for Judgment as a Matter of Law or in the Alternative, Motion for New Trial (R. 157);[6]

5. Plaintiff's Motion for Attorney Fees (R. 162); and

6. Defendant's Motion to Supplement the Record (R. 189).

### FACTS

Plaintiff Karen Emmel graduated from college in 1976. In mid-July 1976, she began working for defendant Coca–Cola (Tr. 892.) Her first position with defendant was as an account manager. (Tr. 893.) As an account manager, she was responsible for approximately 300 to 350 accounts consisting of grocery stores, drug stores, liquor stores, gas

---

**5.** 42 U.S.C. § 1981a(b)(3)(D) states:
(3) Limitations
The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

**6.** Since the defendant, and not the plaintiff, has moved for judgment as a matter of law or, in the alternative for a new trial, the court has focused its attention on the facts pertinent to the jury's verdict for the plaintiff. The court has evaluated the evidence with regard to that motion, as it must, in the light most favorable to the nonmoving plaintiff. *Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir.1994); *Grove Fresh Distributors, Inc. v. New England Apple Products Company, Inc.,* 969 F.2d 552, 558 (7th Cir.1992).

stations and choice accounts such as Jewel, Dominick's and A & P, to which she would go and take orders. She also supervised the drivers who delivered to each account. (Tr. 893.)

Ms. Emmel's next position with the defendant company was as a Route Manager, which position latter became known by the title "District Sales Manager." She began this position in September 1981. (Tr. 895, PX 1.) In this position she supervised approximately eight route sales people and eight helpers. (Tr. 895.) She continued to be involved in sales, had supervisory responsibility for the paperwork pertaining to the customer accounts, was involved in presenting programs and providing equipment to the customers, was responsible for collecting money from both trade accounts and rental accounts in her area, and was involved in discipline of employees. Beginning in 1985, plaintiff became responsible for training new employees on the Noran hand-held computer used by defendant's employees in the business. (Tr. 896–898.) In 1986, plaintiff received the special recognition of being named "Route Manager of the Year" for the defendant company. (Tr. 902.)

In 1988, plaintiff, at the request of defendant's management personnel, moved from her position as a District Sales Manager of the Bottle/Can Division of Coca–Cola to the position of District Sales Manager in a brand new division of the Coca–Cola called the Syrup Division. (Tr. 906–907.) Initially, Ms. Emmel and her co-workers in the new Syrup Division had to survey the equipment of the approximately 1,500 accounts defendant had purchased from Coke USA, "sight unseen." (Tr. 908.) Then the equipment needed to be upgraded which "was a selling job." Ms. Emmel was involved in talking to customers about converting to the new bag-in-the-box package. (Tr. 908–909.) Because Ms. Emmel had no previous experience with the syrup end of the business she had to learn everything about this brand new division. (Tr. 909.) Her territory "was spread out immensely." (Tr. 910.) It covered various Illinois communities including St. Charles, Orland Park, Tinley Park and continuing to Joliet, Aurora and Naperville. (Tr. 909–910.)

Ms. Emmel enjoyed the challenge of the new division. (Tr. 910.)

In October 1989, Ms. Emmel, because of her expertise, was offered the position of Cold Drink Specialist in the North Division of Coca–Cola. John Walsh, Vice President of Sales for the North Zone of the defendant company, told Ms. Emmel "that he was looking for someone with [Ms. Emmel's] expertise that had knowledge of syrup and had knowledge of cans." He told her that "they were going to be calling on prestigious accounts" such as high schools, park districts, and hospitals. (Tr. 912.) Mr. Walsh told Ms. Emmel he knew she could handle it, he knew her "accomplishments as a route manager, and he said [she would] be reporting to him directly." (Tr. 913.)

Ms. Emmel then accepted the Cold Drink Specialist position "but [she told Mr. Walsh that she] did not want to be stagnant." (Tr. 913.) Vice President Walsh "reassured [her] that [she] wouldn't be, that there were plans for this department in the future." (Tr. 913.)

In the position of Cold Drink Specialist Ms. Emmel maintained the exclusive agreements with accounts Coca–Cola previously had and secured new business, upgraded equipment, placed additional equipment and converted accounts to full service so the defendant company could make more money. (Tr. 913–914.) Her office was located at the headquarters of the Coca–Cola's North Zone in Niles, Illinois and was situated physically in the front office of those headquarters in between the region managers' offices and right across the hall from North Zone Vice President John Walsh to whom plaintiff reported directly through July 8, 1992. (Tr. 914.)

On July 8, 1992, a group of new upper-management positions were created at the defendant company, among them were five upper-management positions called Area Development Manager ("ADM"). Each of the five new ADM positions was offered to and filled by a man. Ms. Emmel was offered none of the positions because the defendant company discriminated against her on the basis of her sex. "We felt these guys deserved promotion" (Tr. 917) was the initial explanation Vice President Walsh gave Ms.

Emmel on July 10, 1992 when he told her she also had been considered. After saying "Oh, let's close the door and speak honestly," (Tr. 918) Vice President Walsh privately admitted to Ms. Emmel in his office at Coca–Cola's North Zone headquarters that of the candidates for the recently appointed ADM positions, Ms. Emmel was "the only other one qualified." (Tr. 918.) Vice President Walsh said, "Karen, you know, as we all know, they wanted men in these positions in the past to run ... strike duty." (Tr. 918.)

Vice President Walsh on July 10, 1992 made no mention of any deficiencies in Ms. Emmel's qualifications which would have required her to obtain "recent supervisory experience" as a criterion for her receiving a promotion. (Tr. 1237.) At no time prior to plaintiff's filing of her charge of sex discrimination, did any official of defendant company offer any explanation other than the one articulated by Vice President Walsh that the reason plaintiff was not promoted was because "they wanted men in these positions...." (Tr. 918–919, 1016–1017.) Coca–Cola's counsel at the trial argued that the lack of recent supervisory experience was the reason plaintiff Emmel did not receive a promotion. The jury by its verdict rejected that purported reason as a pretext for defendant's gender discrimination against plaintiff.

The July 8, 1992 Memorandum (PX 79) signed by Coca–Cola's President and Chief Operating Officer William O'Rourke and its Vice President, Sales, H. Thomas Noxon (Tr. 949), announcing the promotions, stated that one of the reasons for the creation of the new ADM positions was:

> "[W]e are restructuring our sales management team in Chicago putting major emphasis on Cold Drink development." (PX 79.)

Plaintiff Emmel's near three years of experience as a "Cold Drink Specialist" and "Cold Drink Representative", in addition to her other substantial experience with the company, made her highly qualified for a promotion in light of Coca–Cola's announced "major emphasis." [7]

One of the five men promoted to fill the ADM positions instead of plaintiff Emmel in July 1992 was an individual named Nick Merenda who had no experience as a Cold Drink Representative. (PX 1.) He was made Ms. Emmel's supervisor. (Tr. 742, 914.) Mr. Merenda was so inexperienced and so unqualified to hold the new ADM position in July 1992 that after occupying the ADM position for over a year he admitted at the trial that he did not know the qualifications for the ADM position and did not know what skills were required for the ADM position. (Tr. 743.)

At the time of the promotions in July 1992 there was a large disparity between Ms. Emmel's work history at Coca–Cola and that of Nick Merenda. Plaintiff had worked full-time for the defendant company for 16 years while Mr. Merenda had worked for about one-third of that time, 5½ years approximately. (Tr. 734.) Ms. Emmel had 8 years supervisory experience in the position of District Sales Manager. (PX 1.) Mr. Merenda had been a District Sales Manager for less than 2½ years. (Tr. 741.) Ms. Emmel had been named "Route Manager of the Year" in 1986 (Tr. 902). Mr. Merenda had never been so recognized. Ms. Emmel's experience as a District Sales Manager had been in the Syrup Division as well as in the Bottle/Can Division of the defendant company. Mr. Merenda had never worked in the Syrup Division. (PX 1.)

At the time of the July 1992 promotions, Ms. Emmel had never received a disciplinary warning for her conduct during her work with the defendant company. In fact, plaintiff's supervisor for nearly three years preceding the July 1992 promotion decisions, Vice President John Walsh, had never criticized plaintiff's work performance. (Tr. 919.) Vice President Walsh at the trial admitted he "always had admiration for the work she had done at the company." (Tr. 305.) Mr. Merenda, however, had received four disciplinary

---

7. Tom Hendricks who was promoted to the position of ADM in July 1992, told plaintiff she had the qualifications for the job and expressed his disbelief at her not being promoted. (Tr. 929.) Another employee of defendant, Kyle Reynolds, who had worked with Ms. Emmel, expressed his belief to management that Ms. Emmel should have been promoted. (Tr. 806.)

warnings from the defendant company for his conduct during the four years before he was promoted to the ADM position. (Tr. 744–48; PX 5, 23, 29, 30, 32.)

Ms. Emmel had a college degree. Mr. Merenda did not. (Tr. 771.) For almost three years Ms. Emmel had occupied the office at the North Zone headquarters of Coca–Cola that was assigned to the ADM position Mr. Merenda filled.

On July 24, 1992 plaintiff Emmel filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") along with a two-page affidavit. (Tr. 923). Plaintiff's EEOC discrimination charge set forth the essence of the facts upon which plaintiff claimed:

> I believe that I was discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that less qualified males were promoted over me. (Tr. 922.)

Approximately a year later, on September 15, 1993, more upper-management promotions were made and announced by the top executives of defendant. Among the promotions were two new ADM positions and three "Key Account Executive" positions. All the people receiving those promotions were men. The memorandum announcing the September 15, 1993 promotions (PX 116) was signed by the defendant company's President and Chief Operating Officer William O'Rourke and the Vice President, Sales, H. Thomas Noxon. (Tr. 950.) Plaintiff was not offered a promotion to any of the three open Key Account Executive positions and was not offered a promotion to either of the two new ADM positions because, as the jury found, defendant discriminated against her based on her sex. (R. 150.)

After the July 1992 promotions, Ms. Emmel's direct supervisor, North Zone Vice President John Walsh, told her that other than the men who had been promoted, she was "the only other one qualified" to be an ADM (Tr. 918). At no time before the September 1993 promotions, had plaintiff received any written evaluations which detracted from her qualifications for a promotion. As stated earlier, Vice President Walsh had never criticized Ms. Emmel's work perfor-

mance (Tr. 919) and "always had admiration for the work she had done at the company." (Tr. 305.) After the September 1993 promotions, plaintiff Emmel filed an additional sex discrimination charge with the EEOC. (Tr. 938, 949).

One of the men promoted in September 1993 was Nick Merenda. He was promoted to the position of Key Account Executive. Mr. Merenda, as stated earlier, had less formal education and had substantially less management experience with the defendant company than plaintiff. Mr. Merenda as of September 1993 had never filled out and presented a written evaluation of an employee's performance. (Tr. 754.) Before Mr. Merenda was able to carry out his assigned supervisory responsibility of presenting a written evaluation to plaintiff Emmel about her performance (Tr. 753–754), he met with Coca–Cola's Division Manager of the North Zone, Jeff Skarb, (Tr. 500) and went over the points to cover at plaintiff's evaluation meeting. (Tr. 514.) By the time Mr. Merenda presented the written evaluation to plaintiff, he had been promoted from the ADM position he had obtained in July 1992 to the position of Key Account Executive. Plaintiff by then had filed the charges of sex discrimination with the EEOC. Division Manager Skarb was present when Mr. Merenda met with Ms. Emmel to review Mr. Merenda's written evaluation of her. Plaintiff Emmel received an overall rating of "Fair" from Mr. Merenda (Tr. 754) to which plaintiff did not agree. (DX 10.)

Another man promoted to an ADM position in September 1993 was Tony Taylor who immediately before his promotion had been a Cold Drink Representative for the defendant. (PX 1.) Mr. Taylor had been the Cold Drink Representative in the company's South Zone for about 1½ years compared to plaintiff's 4½ years in the Cold Drink Representative position in the North Zone. Mr. Taylor had been with the defendant company at that time for about 6 years compared to plaintiff's more than 17 years with the defendant company. (PX 1.)

In addition to the other evidence of the defendant company's discrimination against

plaintiff, the evidence established that the top personnel at the defendant company had voiced in more than an isolated manner their bias against women holding upper-management positions at Coca–Cola.

Defendant's owner, Marvin Herb, informed top company executives who passed the word to other employees "that [he] Marvin Herb, the owner of the company, no longer wanted women in route management." (Tr. 153–54, 903–06, 994.) Vice President, South Zone, Duane Hallstrom, in the presence of Tom Noxon, Vice President Sales, company-wide, in 1986 told Joan Fitzsimons, an employee of defendant, of Mr. Herb's discriminatory gender-biased attitudes, when Ms. Fitzsimons was moved from a route manager position.

Mr. Hallstrom's counterpart at the North Zone headquarters of the defendant company was North Zone Vice President, John Walsh. Vice President Walsh echoed the discriminatory sentiments of the defendant's owner and top management when in July 1992 he admitted "[A]s we all know, they wanted men in these positions ...," (Tr. 918–19) in explanation to plaintiff as the reason why plaintiff had not been promoted. It was reasonable for the jury to infer that the "they" to whom Vice President Walsh was referring in his July 10, 1992 explanation was Coca–Cola's top executives, Messrs. O'Rourke and Noxon, and the company's owner Mr. Herb. It was also reasonable for the jury to infer that Vice President Walsh was going to continue to fulfill the well-known desire of top management to have men hold the upper-management positions denied to plaintiff.

Defendant's President William O'Rourke, himself, at a gathering of company management at the Brookwood Country Club in 1988 or 1989, announced "that he didn't think the beverage industry was where women were meant to be" (Tr. 164) and "that he wouldn't have his own daughters be managers of Coca–Cola Company, that it was a man's business." (Tr. 930, 1072–73.) Defendant's Vice President, H. Thomas Noxon, at another meeting of all Coca–Cola management personnel at McDonald's Lodge in 1990 announced "Let's have the women stand. We're filling our quotas nicely." (Tr. 931.) The evidence showed that these sexist actions and statements of the defendant company's top officials at official company functions fostered an intentionally discriminatory corporate attitude.

The evidence was clear that by the time of the 1992 and 1993 promotion decisions, Coca–Cola's owner and the key executives involved in those decisions had expressed and displayed discriminatory attitudes against women and had the intent to discriminate on the basis of sex. This was also evident when Vice President Walsh behind his closed office door admitted to plaintiff in July 1992: "Karen, as you know, as we all know, they wanted men...." (Tr. 918–19) regarding the people allowed to fill the positions denied to plaintiff in upper-management at the defendant company.

I. *Plaintiff's Motion for Prejudgment Interest* (R. 153)

Plaintiff's counsel in Plaintiff's Motion for Prejudgment Interest argues that:

> "Prejudgment interest should be assessed on the amount of the judgment for $343,-000 at the prime rate from July 8, 1992, the date on which plaintiff was discriminated against because of her sex, up to November 21, 1994, date the judgment was entered." (Plaintiff's Motion for Prejudgment Interest, p. 1.)

■ As an initial matter, the jury's verdict shows that the discriminatory conduct that caused the damages supporting the $343,000 amount did not all occur on July 8, 1992; some occurred on September 15, 1993. Assessing prejudgment interest on the full $343,000 amount back to July 8, 1992 is not warranted. This is especially true since a substantial portion of that amount is punitive damages.

■ Title VII authorizes prejudgment interest as part of the back pay remedy against private employers in cases like this one. *Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 1970–71, 100 L.Ed.2d 549 (1988); *Donnelly v. Yellow Freight System, Inc.,* 874 F.2d 402, 411 (7th Cir.1989). In *Gorenstein Enterprises v. Quality Care–U.S.A., Inc.,* 874 F.2d 431, 436 (7th Cir.1989) the Seventh Circuit stated:

The time has come, we think, to generalize and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violation. *Id.* Without it, compensation to the plaintiff is incomplete and the defendant has incentive to delay.

The award of prejudgment interest is particularly appropriate in a case such as this when the violation was intentional, and indeed outrageous.

The *Gorenstein* case, however, did not involve employment discrimination.

■ In an age discrimination case, *Fortino v. Quasar Co.*, 950 F.2d 389, 397–98 (7th Cir.1991), the Seventh Circuit held that prejudgment interest was not appropriate because punitive damages had been awarded under the statutory scheme allowing a "double" damages penalty. The Seventh Circuit reconciled *Gorenstein* in the *Fortino* opinion by stating:

> We agree both that the purpose of prejudgment interest is to make sure that an award of compensatory damages is fully compensatory and that it is a salutary purpose—as a matter of fact we have held that such interest is presumptively available in cases under federal law. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). But when such interest is added to an award that is half punitive, as the plaintiffs would have us do, it ceases to have a compensatory function and becomes an unauthorized form of punitive damages.
>
> Even confined to the compensatory part of the award, prejudgment interest would be questionable. A recognized if secondary (and often implicit) purpose of punitive damages is to make sure that the judgment does not inadvertently undercompensate the plaintiff.

950 F.2d at 397–98. Under the current posture of the Seventh Circuit law on point, it appears plaintiff's request for prejudgment interest on the punitive damage amount is not sustainable and the request for prejudgment interest on back pay is "questionable." *Id.*

The jury found the back pay amount owed by defendant to plaintiff was $43,000 (R. 150,

Interrogatory No. 7). Defendant in paragraph 7 of its Response to plaintiff's Motion, without any citation to the record and seemingly without any regard or deference for the jury's finding, argues that:

> "7. Plaintiff is eligible to receive back pay in the amount of $4,784.83. $2008.76 of this amount is attributable to the period July 27, 1992 to September 30, 1993. Thus, back pay the rate of $32.70 per week during this period. An additional $421.86 is attributable to the period of September 30, 1993 to November 1, 1993. Finally, additional $2,354.21 or $58.65 per week is attributable to the period of November 1, 1993 to August 9, 1994, when Plaintiff was properly discharged. At most, prejudgment interest could be assessed on only these amounts."

(Defendant's Response to Plaintiff's Motion for Prejudgment Interest, p. 3.) (R. 161.) Defendant does not explain in its motion or by what legal basis it arrived at its purported back pay amount, but its method limiting plaintiff's back pay to that received by other employees is inconsistent with the right of the jury to consider all the evidence. The jury's calculation of $43,000 is consistent with and supported by the exhibits and testimony introduced in the evidence.

■ Initially, it should be noted that defendant had no objection (Tr.1987) to the Special Verdict Interrogatory No. 7 (R. 150):

> INTERROGATORY NO. 7. What is the fair and reasonable amount of the wages and salaries proven to have been lost by plaintiff *to date*, minus any amount resulting from any failure by plaintiff to mitigate her damages, as a result of the discrimination or retaliation proven by the evidence?

(R. 150, Interrogatory No. 7.) (emphasis added) Moreover, based on the evidence, the jury could have reasonably inferred that if plaintiff Emmel had not been discriminated against by defendant, she would have remained in defendant's employ through the date of the verdict in November 1994. From July 1992, when the defendant's initial act of gender discrimination against the plaintiff was committed, through November 21, 1994, when the verdict was returned, is a period of

approximately two years and five months. Consequently, the proper time frame for calculation of plaintiff's back pay in this case is from the first act of discrimination which caused her to lose back pay "to [the] date" of the jury's verdict. (R. 150, Interrogatory No. 7.) Defendant's counsel accepted this point and waived any argument by not objecting to Interrogatory No. 7 at that appropriate time (Tr.1987).

■ Although the court does not know how the jury arrived at its calculation, the jury's verdict does not exceed the bounds of the inferences that could be reasonably drawn from the evidence presented at trial. The jury was not limited to a comparison of individual employees' salaries because the jury had other evidence at its disposal with which to make its determination. *See Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1229–31 (7th Cir.1995).

Defendant's Exhibit 5, which was introduced by agreement (Tr. 1310) and displayed to the jury by defense counsel (Tr. 1310, 1429), provided the jury a range of salaries from which to choose in determining the salary plaintiff would have had as an ADM in July 1992 had she not been discriminated against by defendant. Defendant's Exhibit 5 stated the 1992 "Annual Salary Range" for both the position of ADM and the position of Key Account Executive. That range which became effective January 1, 1992 (Tr. 1258) was $32,500–$50,400 (DX 5) (Tr. 1259). The jury was entitled to use Defendant's Exhibit 5 to determine the amount of plaintiff's back pay salary that she would have received in 1992 had she not been discriminated against by defendant.

Considering plaintiff's substantial and wide-ranging experience plus her expertise in the "Cold Drink" area upon which defendant was placing major emphasis in July 1992, it was reasonable for the jury to determine that plaintiff's appropriate non-discriminatory salary to be at or near the top of the 1992 salary range.

From July 1992 through September 1993, the month when the next upper-management promotions occurred, plaintiff's actual gross annual salary was $35,000 or $2,916.67 per month (DX 13). The total gross income she actually earned during the 15–month period of July 1992 through September 1993 (2916.67 × 15) equalled $43,750. Had plaintiff received the ADM promotion in July 1992 and received the top of the 1992 salary range set forth in Defendant's Exhibit 5 of $50,400 which is $4,200 per month, she would have received a gross salary for the 15 months from July 1992 through September 1993 ($4,200 × 15) equal to $63,000. For that period, using those figures, her lost back pay equalled $19,250 ($63,000 minus $43,750).

Beginning in October 1993, each of the three men who were promoted to the Key Account Executive position in September 1993 received a substantial pay increase (PX 3) over their salaries immediately before their promotions. When they were promoted in September 1993, Messrs. Dulin, Linke and Merenda, the three men promoted to Key Account Executive, received salary increases of 14.28%, 12.24% and 9.9% (PX 3) respectively. Had plaintiff Emmel been promoted in September 1993 to Key Account Executive from the ADM position and received a 14% pay increase on her 1992 ADM annual salary, as Mr. Dulin did (Tr. 1089), plaintiff would have then received $57,456 annual gross salary which is equal to $4,788 per month beginning October 1, 1993. During October 1993 plaintiff was still earning a monthly salary of $2,916.67 in the position of Cold Drink Representative. Consequently, her lost salary during the month of October 1993 as a result of defendant's discrimination equalled $1,872 ($4,788 minus $2,916).

Effective November 1, 1993, plaintiff though still in the Cold Drink Representative position, received a 5% pay increase from $35,000 annually to $36,750 annually (Tr. 1083–84, 1370) or $3,062.50 per month. (PX 1, DX 13.) For the year from November 1, 1993 through October 31, 1994 the jury could infer that plaintiff's annual gross salary rate would have remained at $36,750. Based on the jury's findings, had plaintiff not been discriminated against, she would have been promoted to both the 1992 ADM position and the 1993 Key Account Executive position. Had she been compensated as the jury was entitled to find based on the evidence discussed above she would have earned an an-

nual gross salary of $57,456 beginning October 1, 1993. At that salary rate plaintiff would have earned $57,456 in gross annual salary for the year November 1, 1993 through October 31, 1994. Therefore, the proper lost back pay damages for the period of November 1, 1993 through October 31, 1993, equals $20,706 ($57,456 minus $36,750). During the 21 days of November 1994 up to the verdict, the salary rate she would have earned if she had not been discriminated against was $4,788 per month ($57,456 annual salary divided by 12 months). When reduced by the $3,062.50 per month which plaintiff would have earned had she not been discharged, the result of that calculation ($4,788 minus $3,062.50) is $1,725.50. Dividing $1,725.50 by 30 (the total number of days in November) and multiplying that number by 21 (days in November 1994 to the verdict) equals $1,207.85.

Based on the calculations and figures just discussed and proven at trial, plaintiff's lost back pay earnings resulting from defendant's discrimination from the time of the first discrimination up to the date of the jury's verdict are:

| | |
|---|---|
| $19,250.00 | July 1992 through September 1993 |
| 1,872.00 | October 1993 |
| 20,706.00 | November 1, 1993 through October 31, 1994 |
| 1,207.85 | November 1, 1994 through November 21, 1994 |
| $43,035.85 | Total |

■ Although the jury's $43,000 back pay determination clearly is supported by the evidence, the language in the Seventh Circuit's most recent discussion on the issue of prejudgment interest does not bode well for plaintiff receiving prejudgment interest. In discussing its own precedent as well as authority from other circuits, the Seventh Circuit in *Reich v. Sea Sprite Boat Company,* 64 F.3d 332 (7th Cir.1995) stated that:

[W]e have held that the penalty component of such double or triple damages schemes sometimes serves in lieu of prejudgment interest on the compensatory portion of the award. *Fortino v. Quasar Co.,* 950 F.2d 389, 397–98 (7th Cir.1991). Contra, *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1101–03 (3d Cir.1995) (holding that the plaintiff is entitled to prejudgment interest on the compensatory portion of the award). Prejudgment interest also creates a risk of exceeding the maximum

penalty, often set at a maximum dollar award per transgression. See *Rodgers v. United States,* 332 U.S. 371, 374, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947).

*Id.* at 333. By citing the *Starceski* case which is consistent with decisions from the Second, Ninth and Eleventh Circuits, 54 F.3d at 1102, as contrary to Seventh Circuit law, the Seventh Circuit in *Sea Sprite Boat,* 64 F.3d at 333, sent the clear message that prejudgment interest is disfavored in the Seventh Circuit when punitive damages have been awarded. Consequently, this court declines to assess prejudgment interest on the $43,000 back pay due from defendant to plaintiff as a result of defendant's sex discrimination against plaintiff as proven by the evidence in this case.

II. *Plaintiff's Motion for Restitution of Lost Benefits Resulting from Employment Discrimination by Defendant in Making Management Promotions to the Positions to which Plaintiff was Denied* (R. 154.)

The enforcement provision of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–5(g) states:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in any unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, ..., or any other equitable relief as the court deems appropriate.

■ This court finds that the evidence clearly supports the jury's verdict that defendant intentionally and maliciously, or at least, with reckless indifference for plaintiff's rights, engaged in the unlawful employment practice of discriminating against plaintiff because of her gender as to the three promotions upon which the jury found in plaintiff's favor. To the extent that benefits should have flowed to plaintiff as a result of the positions she was denied because of the defendant's intentional and unlawful conduct, those benefits should be considered as part of the back wages and salary that plaintiff

was deprived of due to defendant's unlawful conduct.

The evidence presented at the trial does not adequately show the value of the benefits of which defendant unlawfully deprived plaintiff beyond the $43,000 in back wages the jury found based on the evidence. (Tr. 1418–19.)

To the extent that such benefits or return of contributions remain due plaintiff at this time as result of plaintiff's termination from defendant's employ on August 9, 1994, which the jury found was not retaliatory, such benefits are beyond the scope of the claims that were tried in this case. Such benefits and return of contributions, to the extent they were not a part of this case, are not precluded by this adjudication from being sought. If further legal action is necessary to recover such benefits or return of contributions, that legal action will have to be pursued outside the context of this case.

Despite the court's finding as to defendant's unlawful conduct based upon the jury's verdict and this court's own assessment of the evidence, this motion is denied.

III. *Plaintiff's Motion for Permanent Injunction Enjoining Further Violation of 42 U.S.C. § 2000e–2(a) and Enjoining Defendant from Considering Gender in Making Management Promotions to the Positions to which Plaintiff was Denied* (R. 155.)

■ Ordinarily, this court believes that no injunction should be necessary to ensure that any defendant complies with the employment discrimination laws of the United States. Given the fact, however, that the evidence established at the trial that the defendant company had a policy of intentional gender discrimination that victimized the plaintiff and given the fact that the evidence showed that policy emanated from the owner of Coca–Cola, Marvin Herb, and pervaded the decisions of defendant's top-management over a number of years may make this case the exception.

■ The fact that plaintiff was lawfully discharged from defendant because she photocopied at defendant's offices certain documents that plaintiff believed were pertinent to her lawsuit and not in retaliation for bringing the suit eliminates any possible reinstatement order being entered by this court pertaining to plaintiff's employment with defendant. That being the case any permanent injunction against defendant engaging in any future gender discrimination would not pertain to plaintiff. This was not an enforcement action brought by the EEOC to protect certain putative employees of defendant. Perhaps the EEOC should closely monitor the conduct of defendant Coca–Cola in the future pursuant to its statutory empowerment in 42 U.S.C. § 2000e–5(a) "to prevent any person from engaging in any unlawful employment practice," given the deliberate policy of gender discrimination shown by the evidence under which plaintiff suffered at defendant company. A permanent injunction against defendant's future similar violations emanating from this private case, however, would not be appropriate. *See City of Chicago v. Matchmaker Real Estate Sales Ctr., Inc.,* 982 F.2d 1086, 1094 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993). This motion is denied.

IV. *Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial* (R. 157.) [8]

A. *The Weight of the Evidence Supports the Verdict*

■ Defendant's initial post-trial assertion is that:

1. The jury verdict is against the weight of the evidence.

(D's.Mo.J., p. 2.) The facts, as discussed earlier on pages 6 through 16 of this opinion, established that the gender discrimination which victimized plaintiff in 1992 and 1993 was the result of a long-standing company policy dictated by the defendant company's owner Marvin Herb and carried out by the defendant company's top officials. Defendant in its Reply Memorandum on this Mo-

---

8. This motion will hereinafter be cited as "D's.Mo.J."

tion seeks to reargue the "recent supervisory experience" pretext (D's. Reply Memo, p. 1) that defendant presented to the jury and that the jury rejected in reaching its verdict.

Vice President Walsh after he closed the door to his office to "speak honestly" (Tr. 918) during his conversation with plaintiff on July 10, 1992 told plaintiff Emmel that she was as qualified as the men who were promoted but the reason she was not promoted was, "as we all know, they [defendant's top management] wanted men in these positions...." (Tr. 918) clearly informing plaintiff that defendant's top management desired men and not women in the upper-management positions. The direct evidence of these statements to plaintiff by Vice President Walsh, who defendant claims was the decision-maker, demonstrate Mr. Walsh's intent to adhere to the gender-biased policies of the defendant regardless of plaintiff's federally protected rights.

The circumstantial evidence of the company's lack of women in the upper-management positions denied to plaintiff is further proof of defendant's intent to engage in the unlawful gender discrimination which victimized plaintiff. As the Seventh Circuit recently stated:

> [T]he 100% sex-segregated workforce is highly suspicious and is sometimes alone sufficient to support judgment for the plaintiff.

*Loyd v. Phillips Brothers, Inc.*, 25 F.3d 518, 524 n. 4 (7th Cir.1994).

The sexism that was expressed in the public announcements by Coca–Cola's top officials at company functions such as the company "was a man's business" (Tr. 930) and that women at the defendant company were there for the purpose of "meeting [the company's] quotas" (Tr. 164, 931) further demonstrated defendant's intent to discriminate against plaintiff. These discriminatory statements, that further support the jury's finding of defendant's intentional sex discrimination, were made by the very same top officials who decided that only men would be promoted to the five new ADM positions in July 1992 and to the two ADM and the three Key Account Executive positions in September 1993 denied to plaintiff.

Defendant's intent to discriminate against plaintiff because of her sex was proven by both direct and circumstantial evidence. The direct evidence, as stated earlier, consisted in part of Vice President Walsh's July 10, 1992 admission to plaintiff that "as we all know, they wanted men in these positions...." (Tr. 918). This admission was very similar to the direct evidence of discrimination discussed by the Seventh Circuit in *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir.1993) (en banc). In *Mojica* the Seventh Circuit, detailing the direct evidence of discriminatory intent to which plaintiff testified, stated:

> Mojica presented evidence of discrimination at the original trial by testifying that Marv Dyson, the station general manager, told her in 1986 that she would not be promoted into a more lucrative shift because she was not "a black male."
>
> \*   \*   \*   \*   \*   \*
>
> Gannett argues simply that Marv Dyson never made the statement. But the jury could have believed Mojica. Because we conclude that the verdict is supported, we need not comment on any of the other evidence Mojica relied on to prove discrimination.

In this case, plaintiff Emmel not only established her claims by direct evidence, but also by presenting persuasive circumstantial evidence of defendant's discriminatory intent. The facts in this case closely follow the three types of circumstantial evidence the Seventh Circuit described in *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736–37 (7th Cir.1994) as sufficient both individually and collectively "to support a judgment for the plaintiff." *Id.* at 736.

In discussing the three types of circumstantial evidence which prove discriminatory intent, the Seventh Circuit in *Troupe* stated:

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn.

20 F.3d at 736.

Defendant's South Zone Vice President Duane Hallstrom's statements to Joan Fitzsi-

mons, another female management person at defendant, in the presence of company-wide Vice President Noxon in 1986 "that Marvin Herb, the owner of the company, no longer wanted women in route management" (Tr. 153–54, 903–06, 994) is within this category of circumstantial evidence.

Additionally, the statement by defendant's president William O'Rourke to the management personnel gathered at the Brookwood Country Club in 1989 "that he wouldn't have his own daughters be managers of Coca–Cola Company, that it was a man's business," (Tr. 930, 1072–73) also falls within this category. Defendant's Vice President Thomas Noxon's 1990 McDonald's Lodge announcement "Let's have the women stand. We're filling our quotas nicely" (Tr. 931) is also the type of circumstantial evidence that is within this category. Likewise, the Secretary's Day gift is within this type of circumstantial evidence. (PX 33.)

The Seventh Circuit in *Troupe* also stated:

Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment.

20 F.3d at 736.

Within this category is the proof that at defendant Coca–Cola only men had ever held the upper-management positions denied to plaintiff, (Tr. 58–61, 95–96) as well as the fact that men who received promotions at defendant did not have to specifically ask for those promotions (Tr. 741, 787). According to defendant in its Reply on this motion, plaintiff had to ask. In defendant's Reply Brief on this motion, defendant stated:

As an employee of Coca–Cola, in order to "seek" a promotion Plaintiff [Emmel] was required to ask someone in upper management for one. She never did so.

(Ds'.Reply Brief, p. 3 n. 3.) (R. 181.)

Nick Merenda never asked for, nor was he interviewed for, either the 1992 promotion or the 1993 promotion he received (Tr. 741–43) that were both denied to plaintiff.

The Seventh Circuit in *Troupe* further stated:

And [the] third [type of circumstantial proof of intentional discrimination] is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employee's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

20 F.3d at 736.

Defendant's proffered reason that plaintiff Emmel was not promoted because she lacked "recent supervisory experience" which the jury found unworthy of belief is clearly within this category. Of course, the evidence presented at trial did not stop at disproving defendant's proffered pretext. *See St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The proof showed that plaintiff was qualified for the positions and defendant engaged in intentional sex discrimination in reckless indifference for plaintiff's federally protected rights. Therefore, based on all the evidence in this case—both the direct and circumstantial evidence—there is no question plaintiff Emmel proved the claims that the jury found in her favor.

B. *The Jury's Determination of $43,000 Back Pay is Supported by the Evidence*

The defendant's second argument in this motion is:

2. The jury incorrectly calculated back pay of $43,000, whereas the evidence in this case establishes that Plaintiff is entitled to, at most, $4,784.83."

(D's.Mo.J., p. 2.)

As shown in the discussion on pages 18 through 23 of this opinion, the jury's determination of $43,000 is supported by the evidence presented at trial. Defendant's argument is without merit.

C. *The Court's Instructing the Jury on Punitive Damages was Appropriate and Correct Based on the Evidence*

The defendant's third argument in this motion is:

3. This Court erroneously instructed the jury that it could award punitive damages after Plaintiff failed to demonstrate that Coca–Cola engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to Plaintiff's federally protected rights. This was also unfairly prejudicial to Coca–Cola.

(D's.Mo.J., p. 2.) (R. 157.) This argument is also meritless.

Title 42 U.S.C. § 1981a(b)(1) states:

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

██ The jury was instructed by the court on punitive damages in an appropriate and correct manner that was consistent with the evidence and requirements of § 1981a(b)(1) as follows:

In this case you may award punitive damages if you find that defendant Hondo Incorporated engaged in intentional discrimination or retaliation with malice or reckless indifference to the rights of plaintiff Karen Emmel to be free from such intentional discrimination in employment and retaliation for making a charge of employment discrimination.

(Tr. 2094.) The jury's special verdict, Interrogatory No. 9, on punitive damages referred the jury explicitly to the jury instructions and informed the jury the punitive damages decision was in their discretion. That special verdict interrogatory stated:

INTERROGATORY NO. 9. Under the law as given to you in these instructions, and in the exercise of your discretion, what amount of punitive and exemplary damages do you find is appropriate fairly and reasonably, in light of HONDO INCORPORATED'S financial condition, to punish

the defendant and to deter it and other employers from similar conduct in the future? (R. 150.)

The jury having not been told about the statutory limitation [9] on compensatory and punitive damages found as it stated in answer to Interrogatory No. 9 appropriate punitive damages to be $500,000. (R. 150, Answer to Interrogatory No. 9.)

D. *The Jury's Verdict Awarding Punitive Damages was Well Supported by the Evidence*

Defendant, while ignoring the law which requires this court and any reviewing court to view the evidence in the light most favorable to plaintiff, *see Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir.1994); *Carr v. Allison Gas Turbine Division, General Motors Corporation,* 32 F.3d 1007, 1008 (7th Cir.1994), states as the fourth point in this motion in initial part:

4. The jury erroneously returned a punitive damages award of $500,000 for Plaintiff even though there was no evidence that Coca–Cola engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of plaintiff. . . ."

(D's.Mo.J., p. 2.) (R. 157.)

██ The evidence, especially when viewed as this court must in this post-trial setting, demonstrated a deliberate policy of sex discrimination by defendant against women being promoted into the upper-management positions denied plaintiff and clearly supports the jury's finding that defendant "acted with malice or reckless indifference to the federally protected rights" 42 U.S.C. § 1981a(b)(1), of plaintiff because of her gender.

██ There is no statutory requirement in 42 U.S.C. § 1981a(b)(1) or anywhere else in Title VII that the punitive damage award against a defendant who acted with malice or reckless indifference for an aggrieved individual's federally protected rights

---

9. 42 U.S.C. § 1981a(c)(2) states:
If a complaining party seeks compensatory or punitive damages under this section—

(2) the court shall not inform the jury of the limitations described in subsection (b)(3) of this section.

be related proportionately to compensatory or back pay damages. The award here was not so grossly excessive that "no rational trier of fact" could have reached the same result. *See Honda Motor Co., Ltd. v. Oberg,* —— U.S. ——, —— n. 10, 114 S.Ct. 2331, 2341 n. 10, 129 L.Ed.2d 336 (1994), quoting *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979).

### E. *The Evidence Presented at Trial was Properly Admitted*

The fifth post-trial argument defendant raises in its Motion is:

5. This Court erroneously denied Coca–Cola's motions in limine to exclude certain irrelevant, immaterial testimony or evidence and then correspondingly erroneously admitted such testimony and evidence at trial, which was unfairly prejudicial to Coca–Cola, . . . ."

(D's.Mo.J., p. 3.)  (R. 157.)

Defendant cites no case authority in its motion (R. 151, p. 2) or memorandum (R. 158, p. 9) to support its position on any of the five items of evidence on which it claims error. It merely cites to its previous motions *in limine* which were considered and ruled upon by the court pretrial. (R. 129.) Much, if not all, of the evidence of which defendant complains was admissible as circumstantial evidence discussed earlier at page 29 through 33 of this opinion. This court applied the Federal Rules of Evidence in overruling defendant's objections. Defendant's position is without merit.

### F. *The Court Properly Exercised its Discretion in Ruling on Defendant's Exhibits 8, 9 and 39*

In paragraph number 6 of its motion defendant argues:

6. This Court erroneously excluded from evidence several of Coca–Cola's exhibits, as well as relevant testimony, including, but not limited to, the following: (a) Defendant's Exhibit 8—Comparison of Available Products (and blow-up) together with back-up documents; (b) Defendant's Exhibit 9—Discontinued/Added Product Lines (and blow-up) together with back up documents; and (c) Defendant's Exhibit 39—Post 1991 Applicant Information and (blow-up). This was unfairly prejudicial to Coca–Cola. (D's.Mo.J., p. 3.) (R. 157.)

In neither its Motion (D's.Mo.J., p. 3, R. 157), its Memorandum (R. 158) nor its Reply Brief (R. 181) does defendant cite any authority in support of its position as to the admissibility of these three exhibits.

■■■ Defendant's Exhibit 8 was not only not relevant, it was cumulative. (Tr. 1190.) Defense counsel at no time showed that plaintiff was not aware of, or could not promptly become familiar with, the product changes enumerated. Additionally, the witness John Walsh testified to every item of information contained on the summary document Defendant's Exhibit 8 before the exhibit was offered in evidence (Tr. 1190) so the exhibit was clearly cumulative. Moreover, defendant was not prejudiced because defense counsel could argue each fact and point of information contained on the summary sheet Defendant's Exhibit 8 without the exhibit. The court so informed defense counsel. (Tr. 1203.)

■■■ As to Defendant's Exhibit 9, defense counsel failed to lay a proper business records foundation in compliance with Federal Rules of Evidence 803(6) [10] in that there was no testimony the documents in Defendant's Exhibit 9 were "made at or near the time [of the events recorded] by, or from information transmitted by a person with knowledge."

10.  Fed.R.Evid. 803(6) states:
    (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term business as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

(Tr. 1114.) Additionally, defense counsel had not produced the documents in Defendant's Exhibit 9 to plaintiff's counsel during pretrial discovery. (Tr. 1116.) The documents in Defendant's Exhibit 9 were called for in discovery (Tr. 1121–25) and were relevant to issues on trial (Tr. 1128–29) and should have been produced by defendant to plaintiff's counsel during the discovery period of this case. They were not. (Tr. 1116.)

■ As for Defendant's Exhibit 39, a summary document, defense counsel had not sufficiently established through proper proof the relevance, or compliance with Federal Rules of Evidence 1006 [11] (Tr. 1269–76) or the accuracy of the information on the exhibit. (Tr. 1312–15.) Moreover, a substantial right of the defendant was not affected by any of these exhibits not being admitted in evidence as required by Federal Rule of Evidence 103(a).[12]

G. *The Court Properly Exercised its Discretion as to the Admissibility of Other Evidence to which Defendant Objected*

■ Perhaps understanding the weakness of its positions regarding paragraphs numbered 5 and 6 in its post-trial motion defendant presents catch-all paragraph number 7 which in part states:

> 7. This Court erroneously admitted numerous, irrelevant, immaterial Plaintiff's exhibits and accompanying testimony, . . . .
> This was unfairly prejudicial to Coca-Cola.

(D's.Mo.J., p. 4.) (R. 157.)

Defendant lists in its Motion almost every plaintiff's exhibit to which defendant made a relevance objection. Defense counsel, however, in its Motion (D's.Mo.J. p. 7) (R. 157), its Memorandum in Support (R. 158) or its Reply Brief (R. 181) again fails to cite any authority as support for its argument of how

the plaintiff's exhibits admitted in evidence were not relevant. Each exhibit was derived from records or items used in defendant's business. Each exhibit pertained to plaintiff's employment. Each of them had the "tendency to make the existence [of the disputed facts in issue] more probable or less probable than it would be without the evidence" as required by Federal Rule of Evidence 401. The court made the evidentiary rulings reflected in the record as to each item of evidence. The court was well within its proper exercise of discretion as to each ruling. Defendant has not shown any error or how a substantial right was affected, *see* Fed.R.Evid. 103(a).

H. *The Jury was Properly Instructed*

Defendant argues in point 8 of its Motion that:

> 8. This Court erroneously failed to instruct the jury as requested by Coca-Cola in . . . unfairly prejudicial ways. . . ."

(D's.Mo.J., p. 4.) (R. 157.) Defendant lists eight instructions upon which it is now claiming error. Each will be addressed below.

■ At the outset the court must note that defendant's counsel once again ignores well-established principles of law. The Seventh Circuit has consistently held that "[i]t is familiar law that we must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *General Leaseways, Inc. v. National Truck Leasing,* 830 F.2d 716, 725 (7th Cir.1987). Since defendant makes no claim that the jury instructions, taken as a whole, were deficient, defendant's objection as a general matter should be overruled on this point. *See Stachniak v. Hayes,* 989 F.2d 914, 920 (7th Cir.1993). The defendant's instructions not given by the court were either incorrect statements of law, con-

---

11. Fed.R.Evid. 1006 states:
Rule 1006—Summaries
The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.

The court may order that they be produced in court.

12. Fed.R.Evid. 103(a) states:
(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and. . . .

tained improper factual arguments which the jury was to decide for itself, or were covered by other instructions. The jury charge, as a whole, was fair and correctly instructed the jury on the applicable law.

The court spent several hours with the parties in conference to resolve the instructions, and made all efforts to give both parties a fair trial. No error of which defendant now claims exists in the jury instructions would have affected the jury's verdict. *See Northbrook Excess & Surplus v. Procter & Gamble,* 924 F.2d 633, 638 (7th Cir.1991).

An even more compelling reason, than the lack of merit in defendant's arguments not to grant defendant's motion as to the jury instructions, is that defense counsel waived each and every argument now raised posttrial at the jury instruction conference which was on the record.

■ As the Seventh Circuit has made abundantly clear, failure to state a specific timely objection at trial is waiver. In *Thompson v. Boggs,* 33 F.3d 847, 856–57 (7th Cir.1994) the Seventh Circuit reiterated this point:

As we stated in *Stachniak v. Hayes,* 989 F.2d 914, 920 (7th Cir.1993), "Rule 51 of the Federal Rules of Civil Procedure provides that '[n]o party may assign as error to the giving or the failure to given an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.' " "[I]f a party fails to make a specific, timely jury instruction objection during trial, an argument regarding that jury instruction is deemed to be waived for purposes of appeal." *Id.*

The *Stachniak* opinion was not the first articulation by the Seventh Circuit on this point. In *Stachniak,* the Seventh Circuit emphasized the reason for this long-standing rule stating:

Moreover, if a party fails to make a specific, timely jury instruction objection during trial, an argument regarding that jury instruction is deemed to be waived for purposes of appeal. As we stated in *Bo-*

*gan v. Stroud,* 958 F.2d 180, 183 (7th Cir. 1992) (emphasis added):

"Rule 51 of the Federal Rules of Civil Procedure provides that '[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.' Fed.R.Civ.P. 51. *'Not only must the party object to the jury instructions, its "objection must be sufficiently detailed to draw the court's attention to the defect [in the jury instruction]." ' Sims v. Mulcahy,* 902 F.2d 524, 535 (7th Cir.), *cert. denied,* [498] U.S. [897], 111 S.Ct. 249 [112 L.Ed.2d 207] (1990) (quoting *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1295 (7th Cir.1987))."

When objecting to a jury instruction, the party's objection must be specific and contemporaneous with the alleged error to give the court an opportunity to correct the error before jury deliberation, if in fact there is error. *Id; Sims,* 902 F.2d at 535.

989 F.2d at 920 (emphasis in original).

The first jury instruction refused by the court to which the defendant now ascribes error post-trial is Defendant's Instruction 10. Defendant's post trial submission states:

(a) This Court did not instruct the jury as to Coca–Cola's theory of the case, as appropriate, with respect to Plaintiff's failure to promote claims as requested by Defendant's Proposed Jury Instruction No. 10;

(D's.Mo.J., p. 4.)

■ Defense counsel's complete statement at the jury instruction conference regarding Defendant's Proposed Jury Instruction 10 on the record was:

MS. PANICH: Defendant tenders its Instruction No. 10 as a proper statement of the claim, which the Court has rejected, I believe. (Tr. 1990.)

This statement by defense counsel was insufficient to preserve any error and constituted a waiver of any objection to the court's failure to give that instruction.

Defendant's Proposed Instruction 11 is the next instruction which was not given as proposed by defendant of which defendant complains post-trial:

(b) This court did not instruct the jury that Plaintiff had to establish a prima facie case of discrimination as requested by Defendant's Proposes Jury Instruction No. 11;

(D's.Mo.J., p. 4.)

■ At the on-the-record conference, defense counsel's only comments regarding Defendant's Proposed Jury Instruction No. 11 was:

MS. PANICH: Defendant tenders its Proposed Jury Instruction No. 11, which, likewise, I believe the Court has indicated it will refuse.

(Tr. 1990.) Likewise, under the law, this did not preserve any objection and was a waiver. *See Thompson,* 33 F.3d at 856–57; *Stachniak,* 989 F.2d at 920.

In paragraph (c) of Defendant's Motion defendant states:

(c) This court did not instruct the jury as to the proper law with regard to discrimination cases as requested by Defendant's Proposed Jury Instruction No. 12;

(D's.Mo.J., p. 5.)

■ At the on-the-record conference, defense counsel expressly waived any objection as to the failure to give Defendant's Proposed Instruction No. 12 when the court asked for further objections stating:

THE COURT: All right, any further objections to the instructions that are being given or the instructions which have been refused?

MS. PANICH: Yes. I don't know if I mentioned on the record before we took our last little break Defendant's Instruction No. 12. If I did, then I withdraw those remarks, because we will withdraw our Proposed 12 insofar as we do believe that it is now covered in the Court's Instruction No. 14–A.

THE COURT: Okay.

(Tr. 1991–92.)

As to Defendant's Proposed Instruction No. 14, defendant argues post-trial:

(d) This Court did not instruct the jury that it should disregard as irrelevant all decisions related to recommendations for promotions made by persons other than John Walsh if the jury found that Walsh was the decisionmaker as requested by Defendant's Proposed Jury Instruction No. 14;

(D's.Mo.J., p. 5.)

All that was said by defendant's counsel at the jury instruction conference was:

Defendant does tender to the Court Defendant's Proposed Jury Instruction No. 14.

(Tr. 1992.)

In its post-trial motion defendant argues as to Defendant's Proposed Instruction No. 15:

(e) With respect to Plaintiff's claim that there is an absence of women in upper management in Coca–Cola's Bottle/Can Division, this Court did not instruct the jury to consider evidence or lack of evidence of the relevant labor market, the qualified applicant pool, and the relative numbers of men and women who were both qualified for and interested in upper management jobs in Coca–Cola's Bottle/Can Division as requested by Defendant's Proposed Jury Instruction No. 15;

At the jury instruction conference defendant's counsel merely stated:

MS. PANICH: Defendant tenders its Proposed Jury Instruction No. 15.

(Tr. 1992.)

The next jury instruction objection argued post-trial by defendant's counsel relates to Defendant's Proposed Jury Instruction No. 20 and is as follows:

(f) This Court did not instruct the jury to disregard background evidence that was not sufficiently like or reasonably related to Plaintiff's claims or that did not affect any decision taken by any decisionmaker with regard to the challenged decisions as requested by Defendant's Proposed Jury Instruction No. 20;

(D's.Mo.J., p. 5.) At the conference during trial, defense counsel only stated:

MS. PANICH: Defendant tenders to the Court its Proposed Jury Instruction No. 20.

(Tr. 1993.)

The court will not belabor the issue of defendant's waiver of objections as to the above-discussed instructions or Defendant's Proposed Jury Instructions No. 21, 22 and 23. (D's.Mo.J., p. 6.) The entire discussion as to the latter proposed instructions at the on-the-record jury instruction conference was as follows:

MS. PANICH: Defendant offers its Proposed Jury Instruction No. 21.

THE COURT: That will be refused. It also is argumentative. It's covered in other areas of the instructions. I believe it misstates the fair inferences that the jury should be allowed to draw from the evidence.

MS. PANICH: Defendant tenders to the Court its Proposed Jury Instruction No. 22.

THE COURT: That will be given as modified. You tendered it in the unmodified form?

MS. PANICH: Yes.

THE COURT: It will be given as modified.

MS. PANICH: Defendant tenders to the Court its Proposed Jury Instruction No. 23.

THE COURT: Instruction 23 is argumentative with regard to the facts and is adequately covered in other instructions.

To make sure there were no further objections to the jury instructions the court inquired outside the jury's presence before the jury commenced deliberations:

THE COURT: All right, are there any further objections to the jury instructions or the manner in which they were read?

MR. ROSSIELLO: None.

MS. PANICH: None, your Honor.

(Tr. 2102.) There is no question the objections now raised post-trial by defendant as to the jury instructions were waived.

I. *Plaintiff's Counsel had a Good Faith Basis to Inquire about Defense Counsel's Comment to Witness Kyle Reynolds*

█ Defense counsel attacks plaintiff's counsel in paragraph number 9 in its post-trial motion claiming as follows:

9. Plaintiff's counsel, Margaret A. Zuleger, engaged in inappropriate conduct that was unfairly prejudicial to Coca–Cola. Specifically, Plaintiff's counsel asked witness Kyle Reynolds in the presence of the jury if Defendant's counsel, Marian C. Haney, had brought up a personal matter with him prior to trial, implying that Reynolds was threatened so that he would given testimony favorable to Coca–Cola. At his pretrial deposition, Reynolds denied under oath the existence of any such communication. Plaintiff's counsel had no legitimate basis for asking such question and clearly intended to prejudice the jury against Coca–Cola and its counsel.

(D's.Mo.J., p. 5.)

After reviewing the transcript excerpt of Mr. Reynold's deposition, specifically the part in which defense counsel Ms. Haney was questioning Mr. Reynolds, and reviewing the trial transcript of the questions posed in the jury's presence by plaintiff's counsel on this subject and the answers given (Tr. 814) as well as the concession by defendant's counsel that at the time of his deposition: "He [Mr. Reynolds] said there was something that Ms. Haney [defendant's counsel] said that rubbed him [Mr. Reynolds] the wrong way" (Tr. 818), the court finds plaintiff's counsel, Ms. Zuleger, was well within the bounds of proper conduct to engage in the inquiry in which she engaged in front of the jury. (Tr. 814.) Defendant's mistrial motion was properly denied. (Tr. 821.)

J. *The Court was Neither Partial Toward Plaintiff Nor Biased Against Defendant*

Lastly, defendant attacks the court by claiming among its other accusations that:

10. This Court showed extraordinary partiality in favor of Plaintiff. Before and during the trial of this case, this Court

exhibited an open and obvious bias against Coca–Cola and in favor of Plaintiff.

As an initial matter, this court denies defendant's accusation of bias. Second, since it is made by defense counsel in a post-trial motion seeking to overturn an adverse judgment on the jury's verdict, this accusation lacks credibility. Had defense counsel actually believed this court was improperly biased, defendant should have filed a motion seeking this court's recusal. No such motion was ever filed. So the court has never had the opportunity to properly address the issue.

■ Defense counsel did not argue bias before the plaintiff had rested her case-in-chief and after the defense case had begun when prospects of a verdict favorable to defendant did not look bright. Even then defense counsel predicated the accusations of bias on rulings by the court. (Tr. 1202.) A defendant who waits until it appears there will be an adverse result and only then begins to make an allegation of bias should be looked upon with caution. Such an issue should be raised at the earliest time and properly should be raised by motion rather than counsel orally accusing the judge of bias during trial as was the case here. (Tr. 1202, 1510–13, 1964.)

This court understands now and understood during the trial that there is no explicit requirement for a motion under 28 U.S.C. § 455 or for the timeliness thereof. When defense counsel first accused the court of bias, the court evaluated whether a recusal *sua sponte* was appropriate. Applying the proper requirements of 28 U.S.C. § 455, the court found no recusal was required, *see Liteky v. United States,* —— U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) and continued to preside over the case.

■ This court presided over all pretrial matters, reviewed certain evidence pretrial, reviewed and ruled on the defendant's pretrial Motion for Summary Judgment (R. 84), and reviewed and ruled on plaintiff's Motion for Reinstatement Pendente Lite (R. 92). In doing so the court had gained knowledge about the case and insight into the tactics of counsel. This knowledge came from no extra-judicial source but from information presented in the record of the case. (Tr. 1513–14, 1964–68.) It was not a basis for recusal. Neither the court's judicial rulings nor judicial knowledge serve as a proper basis for either a recusal or a new trial. *See In the Matter of: Huntington Commons Associates,* 21 F.3d 157 (7th Cir.1994).

Defendant's counsel had engaged in several acts of improper conduct for which the court had to admonish them. An example of defense counsel's improper conduct was defense counsels' displaying to the jury exhibits that were not admitted in evidence or suggesting the existence of evidence that did not exist or was not admitted in evidence. (Tr. 1136, 1160, 1312–13.) Federal Rule of Evidence 103(c) states:

> (c) Hearing of jury. In jury cases, proceedings shall be conducted, to the extent possible, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

In addition defense counsel did not make proper disclosures to opposing counsel during pretrial discovery. (Tr. 1271–73, 1721–24.) Defense counsel evaded the court's questions when, outside the jury's presence, the court made inquiries to assist in the determination of the admissibility of evidence. (Tr. 323–24, 1248, 1276, 1725–26.) Defense counsel made misrepresentations and mischaracterizations of facts and pretrial proceedings. (Tr. 1272, 1496–1503.)

Defense counsel engaged in the antics of making inappropriate, mocking, smirking facial gestures as well as laughing disrespectfully at opposing counsel and the court in the jury's presence. (Tr. 1508–16, 1651–55.) This became so aggravated that the court had to admonish counsel. (Tr. 1515–16.) Then when defense counsel engaged in the improper conduct again the next day, the court had to threaten to hold defense counsel in contempt if they did not stop the misconduct. (Tr. 1654.)

During closing argument defendant's counsel Marian Haney tried to inject sympathy for herself into the jury's consideration by improperly arguing outside the record that

she herself had been the victim of sex discrimination and therefore knew what sex discrimination was. (Tr. 2067.)

Finally, in this pending post-trial motion defense counsel again outside the record and without evidence or support made accusations about this court's alleged comments "off the record." (D's.Mo.J. p. 8, ¶¶ (g), (h).) The accusations are false. Defense counsel were given numerous opportunities to make any record they desired in this case and did so. (Tr. 1954–1968, 1970–2008.) Given defense counsel's approach to this case, had the comments defendant ascribes to the court been made, defense counsel certainly would have made a record or referred to such comments on the record. This is not a case where defense counsel shied away from confronting or arguing with the court. Nor did defense counsel display any perceived inability on their part to challenge the court or make any record they desired of their allegations against the court.

Furthermore, as to the on-the-record judicial rulings and statements defense counsel have specified in defendant's post-trial motion (D's.Mo.J., pp. 7–8) only the court's use of the word "commercial" was in the jury's presence. (Tr. 1181.) Before that occurred defense counsel had allowed their witness, corporate representative and defendant's Vice President John Walsh, to testify in a lengthy continuous narrative fashion in response to the question: "What does a monthly report show to you?" (Tr. 1179.) When two transcript pages after the question was posed, Mr. Walsh started to volunteer testimony regarding the thought processes of the Coca–Cola district sales managers and began to describe their thoughts about a commercial put out by a Coca–Cola competitor, Pepsi–Cola, which featured a professional basketball star, Shaquille O'Neal, appearing in endorsement advertisements for Pepsi–Cola, plaintiff's counsel objected. The transcript starting with the preceding question reflects what occurred:

> [by Ms. Haney, defense counsel] (Tr. 1179.)
>
> Q. Now, we've seen in the plaintiff's case a lot of—multiple monthly reports.
>
> A. Right.

> Q. What does a monthly report show to you?
>
> A. A monthly report shows to me what activity was occurring in a certain person's area of responsibility during the month they are reporting on.... [Part of Tr. 1179, all of Tr. 1180, part of Tr. 1181 deleted]

> \*    \*    \*    \*    \*    \*

> For instance, our one-liter package that's relatively new, we've got a pre-price on it. Our district sales managers don't think that's effective. Pepsi has got a Big Slam with Shaquille O'Neal. They think—
>
> MR. ROSSIELLO: Objection. I think that this is going way beyond—
>
> THE COURT: I think we're now having a commercial.
>
> MR. ROSSIELLO: Yes.
>
> THE COURT: Let's get back to the issues at hand here.
>
> THE WITNESS. Okay.

(Tr. 1179–81.)

Everything else about which defendant complains in this part of its post-trial motion occurred outside the jury's presence. None of the court's other comments about which defendant complains were in the jury's presence.

The record establishes that the jury was never influenced by any of the court's comments to defense counsel inside or outside the jury's presence.

The court admonished the jury in the final instructions:

> Upon allowing testimony or other evidence to be introduced over the objection of counsel, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence. As stated before, you, the jurors, are the sole judges of the credibility of all witnesses and the weight and effect of all evidence. (Tr. 2082–83.)

> \*    \*    \*    \*    \*    \*

> Neither by these instructions nor by any ruling or remark which I have made to I mean to indicate any opinion as to the facts or as to what your verdict should be. As

I've said before, you are the sole and exclusive judges of the facts. (Tr. 2095.)

The verdict clearly reflects a decision by the jury that accurately conforms to the evidence. The jury in its verdict found for each side consistent with the evidence. The jury demonstrated no prejudice in making that determination. (R. 150.)

Apropos to the situation here are the Seventh Circuit comments in *United States v. Byrski*, 854 F.2d 955, 964 (7th Cir.1988) when defense counsel used the same type of tactics employed by defense counsel here. The Seventh Circuit in its opinion stated:

> [T]he thrust of their [defense counsel's] arguments was diminished by their unfounded and disrespectful assaults against the federal courts. The tone and tenor of the appellant's arguments did a disservice to both defense bar and the court. We strongly admonish counsel to refrain from such inappropriate and unsupported actions in the future.

For all the reasons stated above, Defendant's Renewed Motion for Judgment as a Matter of Law or in the Alternative, Motion for a New Trial (R. 157) is denied.

## V. *Plaintiff's Motion for Attorney Fees* (R. 162)

Plaintiff was the prevailing party in this case. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 194 (7th Cir.1994) ("In order to be considered a 'prevailing party' in a civil rights action, a plaintiff must obtain at least some relief on the merits."). Under 42 U.S.C. § 2000e–5(k) "the court, in its discretion, may allow the prevailing party, a reasonable attorney's fee (including expert fees) as part of the costs."

Plaintiff who prevailed by obtaining judgment of $43,000 in back pay, plus the maximum statutory limit of $300,000 for compensatory and punitive damages, *see Farrar v. Hobby*, 506 U.S. 103, 110–11, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992), has requested attorneys' fees and expenses of $267,374.78. Plaintiff's motion (R. 162) details the basis and support for plaintiff's request which has been additionally supported and supplemented (R. 177, 178) by attorney affidavits and records. Defendant has opposed (R. 168) plaintiff's request for attorneys' fees and expenses and has also filed attorney affidavits (R. 169, 183). The court will address each of defendant's objections as set out in Defendant's Opposition to Plaintiff's Motion for Attorney Fees ("D's.Opp."). (R. 168.)

### A. *Whether Any Fees and Costs Should be Allowed*

#### (1) *Special Circumstances*

A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." S.Rep. No. 94–1011, p. 4 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5912.

Defendant claims that the "special circumstances which render the award of fees to be unjust are that defendant tried to resolve plaintiff's claims as early as September of 1992 and that plaintiff brought this litigation in bad faith." (D's.Opp., pp. 2–3.) Defendant further complains about plaintiff's counsel's conduct before and at the trial of the case as an additional reason not to award fees. *Id.* Defendant cites no authority to support its argument—an argument that is both factually and legally meritless.

The September 1992 meeting between defendant's head of personnel Sollenberger, defendant's division Manager Skarb and plaintiff was not a good faith attempt by defendant to settle. Indeed, defendant continued to engage in intentional gender discrimination against plaintiff after that meeting. The settlement offer shortly before trial of $25,000 by defendant was not a good faith effort to settle either. Defendant made no offer of judgment under Federal Rule of Civil Procedure 68 which exceeded the amount of the judgment plaintiff obtained. Defendant's allegations against plaintiff's counsel's conduct are spurious. Defendant should not now be awarded the benefit of not having to pay reasonable attorney's fees and expenses under the guise of special circumstances where none exist.

### (2) *Evidentiary Support*

Defendant also claims no fees should be allowed plaintiff because "Nowhere has Plaintiff provided any evidentiary support for an award of fees and costs." (D's.Opp., p. 4.) The court finds the supporting records and affidavits of fees and expenses attached to plaintiff's motion (R. 162, attachments 1–7) plus plaintiff's replies (R. 174, 194) and supplemental filings (R. 177, 178) are adequate under 28 U.S.C. § 1924 for the court to evaluate in determining the appropriate award of reasonable attorney's fees and expenses.

### B. *Whether the Fees and Costs Requested Should be Reduced*

■ Defendant's alternative argument seeks reduction of the fees and costs requested by plaintiff. Since the "lodestar" calculation consists of "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate," *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989), defendant's first attack in this section is on the reasonableness of the hourly rates of plaintiff's counsel. (D's.Opp., p. 5.) The record which was presented in conformance with *Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 425 (7th Cir. 1992) adequately reflects the reasonableness of the $275 per hour request for the time of Mr. Rossiello, the $165 per hour request for Ms. Zuleger,[13] and the $75 per hour request for paralegal time.

### (1) *Partial Success*

■ Defendant claims plaintiff prevailed on only three of her eight claims. (D's.Opp., p. 8.) The United States Supreme Court stated in *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983):

Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

Consequently, counting the number of "claims" as defendant advocates is not appropriate. Instead, the court should "focus on the significance of the overall relief obtained by the plaintiff...." *Id.* The Supreme Court in *Hensley* additionally stated:

Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *Id.*

■ As to plaintiff's sex discrimination claims, plaintiff could have been promoted by defendant had gender discrimination been absent to only one of the positions denied her on July 8, 1992 and to only one of the positions denied her on September 15, 1993. She could not hold two positions simultaneously. Her claims of gender discrimination as to each of those time periods covered by the promotions were overlapping. The claims were based on related legal theories that arose from a common core of facts. *See e.g. City of Riverside v. Rivera*, 477 U.S. 561, 569, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986). Consequently, when she prevailed as to her claim for a promotion to the ADM position that had been denied her intentionally and discriminatorily on July 8, 1992, any other claims for promotion for any other position at the same time became moot. The

---

**13.** Ms. Zuleger's demonstrated skills belie the number of years she has been practicing. Her ability to conduct difficult courtroom examinations, deal with evidentiary issues and follow proper courtroom procedures was commendable. To limit Ms. Zuleger to the lock-step hourly rates some law firms use for associates based on years of practice as opposed to proven ability is unfair. Ms. Zuleger's hourly rate of $165 is a bargain for her clients given the high quality of her legal representation.

same is true as to the September 15, 1993 promotion. Once plaintiff prevailed on her claim that her failure to be promoted to the Key Account Executive position on September 15, 1993 resulted from defendant's intentional discrimination, any claim for promotion to another position at that same time was moot.

■ Furthermore, plaintiff was entitled the back pay she lost resulting from defendant's intentional gender discrimination. She could not, however, receive back pay more than once for any one time period no matter how many of defendant's acts caused her to lose the back pay during that time period.

Plaintiff prevailed as to claims that were consistent for both of the two promotional periods. The fact that plaintiff did not prevail as to other alternative related claims for those promotional periods does not diminish her recovery or the significance of her success on the sex discrimination claims.

Additionally, had plaintiff prevailed as to her retaliation claims, the maximum back pay recovery she could have received was up to the date of the verdict. The jury did consider, without objection from defense counsel (Tr. 1987), and did award plaintiff back pay up to the date of the verdict. (R. 150, Interrogatory No. 7.) Since plaintiff could only recover back pay once for a single time period no matter how many or few of defendant's unlawful acts caused the plaintiff's back pay loss, the plaintiff's failure to prevail on the retaliation claims is of no consequence to back pay recovery obtained by plaintiff.

As to any other recovery plaintiff obtained or could obtain, the only other allowable damages available to a Title VII plaintiff are set out in 42 U.S.C. § 1981a(b)(3) which states:

(3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

\* \* \* \* \* \*

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

Since these enumerated damages were capped at $300,000 in this case, plaintiff could not have achieved greater success for purposes of an award of attorney's fees under 42 U.S.C. § 2000e–5(k) than she obtained even if she had prevailed as to all her claims.

In *Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863 (7th Cir.1995), the plaintiff presented two claims: (1) retaliation and (2) sexual harassment. The Seventh Circuit stated:

Once the trial judge determined that Dunning should prevail on her retaliation claim, there was no need to reach the sexual harassment issue for the requested relief of backpay was granted.

Op. at 873–74. In allowing for full recovery of plaintiff's attorneys fees, the Seventh Circuit explained:

Dunning's two claims had a "common core of facts" and were based on "related legal theories." *Rivera*, 477 U.S. at 569, 106 S.Ct. at 2691–92. Because of the interrelated nature of the two claims, her attorneys had to prepare for the "litigation as a whole," rather than merely preparing for "a series of discreet claims." *Id.* Dunning achieved "excellent results," *id.*, in that she received the relief she requested (back pay for 18 weeks), and the grant of the fee request was not an abuse of discretion.

*Dunning*, at 874. The same analysis applies here.

■ In this case, evidence presented by plaintiff on her retaliation claims was relevant and related to the discrimination claims.[14] Defendant's action of discharging plaintiff for photocopying certain of defen-

---

**14.** Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employ-ment practice by [Title VII]." 42 U.S.C. § 2000e–3(a); *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1457 (7th Cir.1994).

dant's documents and for plaintiff's refusing to promise not to do it again though not unlawfully retaliatory was relevant to the plaintiff's claims of defendant's intentional discrimination and punitive damages, which required proof of "malice or reckless indifference for [plaintiff's] federally protected rights." 42 U.S.C. § 1981a(b)(1). The discharge raised reasonable inferences that defendant had incriminating documents it did not want plaintiff to find and so defendant terminated plaintiff's employment to eliminate the possibility and that defendant discharged plaintiff because it was not going to promote her because of her gender to the upper-management positions she had been denied.

Therefore, focusing on the maximum potential overall recovery available to the plaintiff under Title VII, this was not a partial recovery. Were plaintiff to have prevailed on all of her claims, she could not have achieved, for purposes of evaluating attorney's fees and costs under Title VII, a better overall recovery than the $343,000 judgment obtained. As stated earlier, plaintiff's claims were closely related and based on a "common core of facts" and "related legal theories."

### (2) Contemporaneous Time Records

Contrary to defendant's assertions, plaintiff's counsel dictated or noted their time each day for legal services that were rendered on this case. (Plaintiff's Reply, p. 14; R. 174.) An office secretary then entered the information in a computer that maintained the records. There is no need for a reduction such as occurred in *Dutchak v. Central States, Southeast and Southwest Areas Pension Fund*, 932 F.2d 591, 597 (7th Cir.1991). The time records were made sufficiently contemporaneous to the events recorded to be reliable. *See* Fed.R.Evid. 803(6).

### (3) Proper Form of Records

Defendant complains about the form of plaintiff's counsel's records. (D's.Opp., pp. 10–11.) This court believes the submissions in this case are sufficiently well-documented to allow proper evaluation. In addition, the plaintiff's counsel in this case were the same counsel who represented plaintiff in *Dunning*. The Seventh Circuit in *Dunning, su-*

*pra*, upheld the district court's determination and observed:

> The trial court granted the full amount of attorney's fees requested by Dunning's counsel stating that the fees and costs "were extremely well documented and applie[d] the appropriate criteria," and that Dunning's claims arose from the same basis core facts.

*Dunning*, at 873.

This court, to ensure the correctness of its assessment of the quality of the documentation in this case, reviewed the original court file in *Dunning* pursuant to Fed.R.Evid. 201, especially the post-trial motion for fees filed by plaintiff's counsel. The format plaintiff's counsel used and the documentation plaintiff's counsel submitted in *Dunning* are similar to the format and the submissions of the documentation in this case. Therefore, this court is satisfied that the records supporting plaintiff's requests for attorney's fees and costs in this case are sufficiently well-documented to allow an appropriate and fair evaluation.

### (4) Established Standards for Costs

After reviewing the submissions and the supplementations by plaintiff's counsel filed in the record, the court finds that the costs are sufficiently verified. Defendant's counsel complains that plaintiff's counsel seeks reimbursement for photocopying at $0.20 per page instead of the $0.08–$0.10 per page which plaintiff was charged by the defense. (D's.Opp., p. 14 n. 6.) The court has reviewed the request and finds that though most photocopying charges are at a $.20 rate, other copy charges, such as the second to last list in this category on page 3 of Exhibit 2 of Plaintiff's Motion for Attorneys' Fees (R. 162): "Kinko's—1648 copies 127.18", were at a rate of $0.0772. There is no indication that plaintiff has attempted in any manner to be reimbursed for costs not actually incurred. Likewise, there is no proof that plaintiff's experts did not use the time billed in useful endeavors pertaining to the case.

Consequently, the court has determined that the hourly fees requested by plaintiff's counsel are reasonable and sufficiently documented. "Affidavits from other counsel

practicing in the same market, regarding the rates they charge paying clients for similar work ...," *Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 425 (7th Cir.1992) have been submitted and are comparable to the market rates of plaintiff's counsel and paralegal. (R. 177, 178.)

Defendant has offered no reason why this court should not accept the time expended by plaintiff's counsel and paralegal on this case. Based on this court's familiarity with the case having presided over it from its filing, the court finds the hours expended to be well-documented, appropriate and reasonable.

■ Using the lodestar calculation of "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate," *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989), the total fees requested by plaintiff's counsel are reasonable. Considering "the important factor of the results obtained," *Rivera*, 477 U.S. at 568, 106 S.Ct. at 2691 (quoting *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940), the court will not order any adjustment since the full award of attorneys' fees and costs requested of $267,374.78 is reasonable under all the circumstances of this case.

## VI. *Defendant's Motion to Supplement the Record* (R. 189)

Defendant by this motion (cited as "D's.Mo.Supp.") requests supplementation of the existing record in this case:

> [B]y adding to the trial all existing audio and/or cassette tapes ("the tapes") of the trial of this matter and all other hearings in this case.

(D's.Mo.Supp., p. 1.)

Defendant cites no authority that supports its position. Defendant cites *United States v. McCusker*, 936 F.2d 781 (5th Cir.1991); *United States v. Andiarena*, 823 F.2d 673 (1st Cir.1987); and *United States v. Doyle*, 786 F.2d 1440 (9th Cir.1986). (D's.Mo.Supp., pp. 2–3.) Each of these cases were criminal cases that dealt with exhibits that were tape recordings of events occurring outside the courtroom, not "back up tapes" made by

official court reporters who made the official transcript record of the trials. Defendant considers this to be a "meaningless distinction." (D's.Mo.Supp., p. 3 n. 1.)

■ Title 28 U.S.C. § 753(b) mandates the procedures to be followed by court reporters in official court proceedings. The Act sets forth the means by which court sessions are to be officially recorded. Included in the various allowed means of official recording is "electronic sound recording." *Id.* The Act, however, does not mandate electronic sound recordings be prepared or maintained when another "official" method of recording is used. The official court reporter here followed his usual procedure of preparing mechanical notes and an imprint on a computer disc of court proceedings. As a back up, the court reporter made some sound recordings. The back up sound recordings were prepared for the court reporter's convenience. Not all proceedings of the trial or other hearings were recorded on the court reporter's "back up tapes."

All proceedings of this trial were recorded by the official mechanical note-taking process. The court reporter transcribed all of the trial requested by defense counsel and delivered the transcript to defense counsel in early 1995. Defense counsel has raised no complaint about the accuracy of the transcript the court reporter prepared.

The Act requires each court reporter to "attach his official certificate to the original shorthand notes or other original records so taken and promptly file them with the clerk who shall preserve them in the public records of the court for not less than ten years." *Id.* The Act also requires: "The original notes or other original records and the copy of the transcript in the office of the clerk shall be open during office hours to inspection by a person without charge." *Id.*

Defendant without citation to any authority argues: "The Act's reference to 'other original records' must include electronic sound recordings, such as the tapes here." (D's.Mo.Supp., p. 5.) Not only is defendant's argument unprecedented, it is inconsistent with the Act. Subsection (d) of the Act states in pertinent part:

> (d) The Judicial Conference shall prescribe records which shall be maintained

and reports which shall be filed by the reporters.

Consequently, the Judicial Conference determines what are and are not "other official records" within the meaning of the Act.

The Judicial Conference acting through the Administrative Office of the United States Courts has stated:

Back up tapes made by court reporters for their own convenience and not otherwise required by 28 U.S.C. § 753 are the personal property of the court reporters. There is no public entitlement to these recordings.

*Guide to Judiciary Policies and Procedures,* Court Reporter's Manual, vol. VI, ch. XVI at 14 (Oct. 1991).

Defendant has a complete transcript of the trial and many of the pretrial hearings. The transcript of any other hearings the defendant does not have, but desires, can be ordered from the court reporter. Defendant points to no specific court proceeding or part thereof for purposes of this motion or any other motion, to which defendant desires this court to listen to the court reporter's back up tapes. Defendant wants this court and presumably the judges of the Seventh Circuit, if there is an appeal, in reviewing the record, to listen to whatever parts of the entire trial and of the other court proceedings that were recorded on the court reporter's back up tapes. The trial started November 7, 1994 and ended November 21, 1994. Court was in session on this trial an average of five hours each of the eleven days the court was in session on the trial. There were over a dozen days of additional pretrial status reports and hearings.

■ Defendant's counsel had ample opportunities to make whatever official record they desired in these district court proceedings. Defendant has provided no authority and no valid basis for this court to enter the unprecedented order requiring the court reporter or any other court personnel to file in the public record the court reporter's personal property to which the public has no entitlement.

## CONCLUSION

For the above stated reasons:

Plaintiff's Motion for Prejudgment Interest (R. 153) is DENIED;

Plaintiff's Motion for Lost Benefits Resulting from Employment Discrimination by Defendant (R. 154) is DENIED;

Plaintiff's Motion for Permanent Injunction Enjoining Further Violation of 42 U.S.C. § 2000e–2(a) (R. 155) is DENIED;

Defendant's Renewed Motion for Judgment as a Matter of Law or in the Alternative, Motion for New Trial (R. 157) is DENIED;

Plaintiff's Motion for Attorney Fees (R. 162) is GRANTED; and

Defendant's Motion to Supplement the Record (R. 189) is DENIED.

In addition to the judgment previously entered (R. 152), defendant is ordered to pay plaintiff $267,374.78 in reasonable attorneys' fees and costs. All other motions are moot. Judgment is entered.